ROBERTO NÚÑEZ y CARMEN EMILIA CRUZ, ETC., demandantes y recurrentes, *v.* DR. HERIBERTO CINTRÓN ORTIZ, ETC., demandados y recurridos.

*Número:* R-84-40 *Resuelto:* 29 de junio de 1984

*Miguel A. Velázquez Rivera*, abogado de los recurrentes; *José Guillermo Vivas*, de *Vivas & Martínez Texidor*, abogado del codemandado recurrido Hospital de Damas; *José Méndez Moll*, abogado del codemandado recurrido Dr. Heriberto Cintrón Ortiz; *Harry Viera Villeneuve*, abogado de la codemandada recurrida Administración del Fondo de Compensación al Paciente.

EL Juez ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Al decidir este recurso, cuyo derrotero hacia la justicia ha seguido una ruta llena de dificultades, remembramos que el jurista "[e]ncontrará sin duda un sinfín de ventanas cerradas, de estrellas apagadas, de hombres dormidos. En esta tarea debe saber que no está solo. Su misión es revelar lo justo, así como el artista debe descubrir la belleza, y allí, precisamente, radica la grandeza de su oficio. . . . Deberá ante todo tener fe y munirse de prudencia. Deberá interrogar a la realidad una y otra vez, pensarla en términos concretos, ilustrarse, y por fin actuar. Recordará que el argumento de la razonabilidad será siempre superior a cualquier fórmula que intente apartarse de él (por más que sea). Tendrá presente que el llamado 'mundo jurídico' no está divorciado del real, sino que es parte integrante e inseparable (en sentido ontológico) de éste. Que no se puede ser buen juez y mal padre de familia; ni buen abogado y mal hermano. El hombre de derecho será ante todo un buen o mal hombre". J. E. Leonetti, *El llamado "mundo jurídico" y la realidad*, Rev. La Ley, Año XLVIII, Núm. 50, pág. 1.(¹)

---

(¹) Esta cita meramente ilustra un pensamiento en abstracto. No se refiere a ninguno de los abogados que participaron en el litigio, médicos envueltos, como tampoco al juez sentenciador, Hon. Quintín Morales Ramírez. Este último dedicó

# I

A Roberto Núñez Cruz, de cuatro (4) años, le extirparon las amígdalas y adenoides el 26 de marzo de 1979. La adeno-tonsilectomía la practicó, bajo anestesia general, el otorrino-laringólogo Dr. Heriberto Cintrón Ortiz en el Hospital de Damas, Ponce. Al otro día fue dado de alta en aparente condición satisfactoria. Mostraba niveles normales de hemo-globina (11.3 gramos) y hematocritos (34.3 gramos).

En la madrugada del 30 de marzo de 1979 el niño comenzó a sangrar profusamente por la boca. Ante la hemorragia masiva, sus padres lo trasladaron inmediata-mente al Hospital de Damas. Durante el trayecto continuó sangrando. Llegó a las 4:55 A.M. Fue atendido por el médico de turno y encargada de la Sala de Emergencia doctora Feliciano. Le recetó una dosis de supositorios por la vía rec-tal, otra de Sudafed oralmente y dosis de 20cc. de una solución glucosa conocida como Ringer Lactate. Se le tomó la temperatura por la vía oral y una muestra para CBC de Laboratorio. El expediente refleja temperatura de 39°. (²) No le tomaron ni se anotó en el récord los signos vitales de res-piración, pulso y presión sanguínea. (³)

---

gran parte de su vida a dispensar diligente y eficientemente la justicia. Su valía personal y profesional merece la más profunda deferencia de este foro.

(²) El tribunal de instancia determinó que no se le dio tratamiento al menor para controlar la fiebre. El hospital demandado aduce que el Sudafed fue para reducirla. Sin embargo, este medicamento es un descongestionante nasal. *Physician's Desk Reference*, Medical Economy Co., 1981, págs. 770-771.

(³) El Hospital de Damas no solicitó determinaciones de hechos adicionales ni revisión de la sentencia. Sin base alguna en el récord alega que los signos se tomaron, pero no se anotaron. Sin embargo, no llevó a declarar al personal médico y paramédico que atendió al menor en emergencia que pudo aclarar este aspecto. No alteraremos la conclusión del tribunal de instancia.

Y aún asumiendo que se tomaron los signos, no incluirlos en el expediente constituye una falta de diligencia. Véase *Cruz* v. *Centro Médico de P. R.*, 113 D.P.R. 719 (1983). Con esta omisión se pierde la utilidad futura de la data en una evalua-ción integral médica del curso clínico posterior. Se dejan de proveer las reacciones y signos que la naturaleza fisiológica refleja y que forman parte de los elementos de juicio a tomarse al prescribir el tratamiento adecuado. A. F. Southwick, *The Law of Hospital and Health Care Administration*, H. A. Press, 1978, pág. 301.

Tan pronto administró el tratamiento, la doctora Feliciano ordenó al personal que se comunicaran con el doctor Cintrón Ortiz. Fue llamado a las 6:30 A.M. Desde su residencia el galeno impartió ciertas instrucciones. Indicó que enviaran al paciente a la Sala de Emergencia del Hospital San Lucas donde tenía programadas cinco intervenciones esa mañana. Minutos más tarde llamó y rectificó para que el menor permaneciera en el Hospital de Damas.

El doctor Cintrón llegó a las 7:00 de la mañana. Examinó a Robertito y los resultados de la prueba CBC de laboratorio efectuada a las 6:00 de la mañana. La hemoglobina había bajado alarmantemente hasta 8.5 gramos y los hematocritos a 27.0 gramos. Observó que no estaba sangrando en ese momento. No pudo determinar la vena o arteria que provocó la hemorragia. Concluyó que el niño había perdido una gran cantidad. Ordenó le aplicaran una inyección de vitamina K y una transfusión de 500cc. de sangre pura (*whole blood*). Enfatizó administraran ambas inmediatamente (*STAT*). No determinó la causa de la fiebre de 39° anotada en el récord. Tampoco se desprende del récord la condición, en esta etapa, de los signos vitales como pulso, respiración y presión sanguínea.

Antes de salir para efectuar las otras operaciones, el doctor Cintrón informó a los padres que había examinado al niño, que en su opinión se le había desprendido uno de los puntos de sutura, pero no estaba seguro si era en el área de las amígdalas o de las adenoides. Además les indicó que había dispuesto su hospitalización y que tenía que partir hacia el Hospital San Lucas. Anotó en el expediente que ordenaba la hospitalización —según traducción del tribunal de instancia— para "observación y control de sangramiento" (*observation and control of bleeding*).

El niño permaneció en la Sala de Emergencia. A las 7:30 de la mañana las enfermeras le aplicaron la dosis de vitamina K. Anteriormente le habían suministrado el Sudafed, Tigan y el Ringer Lactate. No se le administró la transfusión

de sangre. Anotaron que la sangre no se ponía en Emergencia sino en el piso, es decir, una vez se le instalara en una habitación.

Aproximadamente a las 10:00 de la mañana lo trasladaron a la habitación núm. 511-B en el departamento de Pediatría. Sus padres lo acompañaban. Lucía visiblemente pálido. Todavía no le habían suministrado la transfusión. Le estaban inyectando el suero Ringer Lactate. Aquí, por primera vez, se anota en el expediente denominado "Perfil de Enfermería" —preparado por la enfermera del piso— el signo vital del ritmo cardíaco. Según determinó el foro de instancia, para esa hora había adquirido proporciones taquicárdicas, 120 pulsaciones por minuto.

Al ser instalado en la habitación eliminó un coágulo. El personal del hospital lo comunicó al doctor Cintrón. Éste no tomó acción de inmediato. No inquirió si le habían administrado la transfusión. Testificó, que en efecto había recibido el informe, pero que su última intervención quirúrgica en San Lucas había terminado a las 10:55 A.M., salió a las 11:30 A.M. y arribó a Damas a las 11:55 A.M. Mientras el tiempo transcurría, el Hospital de Damas no asignó otro facultativo ni el doctor Cintrón Ortiz designó un sustituto para que atendiera al niño durante su ausencia.

Al arribar el doctor Cintrón Ortiz, el padre del menor —que en todo momento lo acompañaba— le informó que el niño estuvo escupiendo sangre. El propio facultativo notó manchas de sangre en la sábana que cubría la cama. El galeno salió al mostrador de enfermeras a hacer unas anotaciones y fue llamado porque el niño estaba sangrando nuevamente. Se observaba pálido y mareado.

Desde ese instante, la hemorragia fluyó continua e ininterrumpidamente. Momentos antes —a las 10:45 A.M.— el personal del hospital había comenzado a administrarle la transfusión que había sido ordenada con carácter de urgencia (STAT), desde las 7:00 A.M. Según la prueba desfilada, esa transfusión de 500cc. de sangre a un niño tarda 2 horas aproximadamente en bajar al organismo.

Ante este cuadro, el doctor Cintrón ordenó el traslado del niño a la sala de operaciones para intentar detectar la hemorragia. A las 12:18 P.M. un anestesiólogo lo examinó. Encontró que tenía una taquicardia de 120 pulsaciones por minuto, lucía pálido, anémico, *shoky* y sangraba profusamente. Anotó en el récord que en caso de que hubiese que aplicarle anestesia debía clasificarse de alto riesgo (4-E).

El doctor Cintrón decidió operar a Robertito. A los 35 minutos de administrarle anestesia, y cuando ya la taquicardia había subido a unas 140 pulsaciones por minuto, ocurrió uno de los riesgos que el anestesiólogo había previsto: el corazón dejó de latir. El paro cardíaco se prolongó por varios minutos. En consecuencia no llegó oxígeno al cerebro. A pesar de que se logró restituir los latidos del corazón, ocurrió una anoxia cerebral. El doctor Cintrón continuó la operación y con carácter de urgencia, ordenó una prueba de laboratorio con la misma expresión utilizada para la transfusión: *STAT*. Al atardecer logró culminar la operación y detener la hemorragia.

La prueba pericial reveló fuera de toda duda que el menor sufrió anoxia cerebral como resultado del paro cardíaco. El daño cerebral es de naturaleza permanente. Ha causado un impedimento ascendente a un 75% de las funciones fisiológicas generales. Esta proporción y tipo de impedimento produce incapacidad total. El menor no podrá realizar labor productiva alguna.

Ante este trasfondo de hechos, los padres del menor por sí y en su representación demandaron al Hospital de Damas y al Dr. Heriberto Cintrón Ortiz reclamando daños por negligencia. En la vista en su fondo las partes desfilaron prueba pericial. El tribunal declaró sin lugar la demanda. Estimó la prueba antes resumida insuficiente para establecer que el tratamiento médico administrado por el doctor Cintrón Ortiz fuera inadecuado o contrario a las normas de la buena práctica de la medicina. En cuanto al hospital, determinó que a pesar de que no administró la transfusión de sangre,

según la orden médica, no tomó los signos vitales, ni asignó otro médico mientras el galeno de cabecera estaba ausente, era especulativo concluir que tal acción u omisión causó el paro cardíaco.

A solicitud de los demandantes revisamos. Procede revoquemos.

## II

*Tendencia judicial sobre la función de los hospitales*

La visión tradicional de concebir a un hospital como simplemente una estructura dotada de facilidades físicas, personal y equipo para la práctica del arte de la medicina se ha ido desvaneciendo. A. R. Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician*, 9 Cal. W.L. Rev. 429, 430–431 (1973). J. D. Cunningham, *The Hospital-Physician Relationship: Hospital Responsibility for Malpractice of Physicians*, 50 Wash. L. Rev. 385 (1975).

Desde años recientes el deber de cuidado hacia el paciente no sólo corresponde a su médico sino al hospital. Aunque al principio vacilante, existe una irreversible tendencia judicial a imponer responsabilidad a un hospital que falla en darle seguimiento y revisar los servicios de médicos acreditados y con privilegios por tratamiento dentro de sus facilidades. Véase J. Kahn, *Hospital Malpractice Prevention*, 27 De Paul L. Rev. 23 (1977). El hospital tiene el poder de retirar el privilegio de uso a aquellos médicos que no cumplen con la reglamentación razonable y válida existente, o que no dispensan el cuidado requerido a sus pacientes. Véase C. R. McCorkle, *Hospital—Physician—Discrimination*, 24 A.L.R.2d 850 (1952). "Reconocemos que los hospitales han ido asumiendo una responsabilidad creciente en relación con la calidad de los servicios rendidos por los médicos de su facultad. Por ello, los hospitales tienen un legítimo interés en que los médicos de sus facultades posean las cualificaciones y observen la conducta requerida para la

consecución del mejor cuido y tratamiento de los pacientes que allí acuden. En ese empeño es necesario que sus medidas de evaluación periódica de la competencia profesional de sus médicos y en relación con el mantenimiento cuidadoso de los records médicos sean de excelencia. Las juntas directivas, por lo tanto, deben velar por que los mecanismos que aseguren la calidad del cuidado de los pacientes sean establecidos y mantenidos celosamente." *Hernández* v. *Asoc. Hosp. del Maestro,* 106 D.P.R. 72, 80–81 (1977).

 El concepto de contratista independiente ha quedado relegado. Véanse *Fridena* v. *Evans,* 622 P.2d 463 (1980); *Purcell* v. *Zimbelman,* 500 P.2d 335 (1972). La dicotomía clásica de hospital y servicios médicos ha ido desapareciendo. "Ello es así porque el médico de hoy depende del hospital del mismo modo que el hospital depende del médico." Southwick, *op. cit.,* pág. 466. Véase A. G. Nadel, *Hospital's Failure to Supervise Doctor,* 12 A.L.R.4th 57 (1982). Así en su relación externa frente al paciente, el hospital es responsable de los actos negligentes de uno de los médicos de su facultad (*staff*). En ciertas circunstancias, también puede ser responsable por aquellos galenos que sólo gozan del privilegio. Bajo esas alternativas, la responsabilidad sería solidaria, sin menoscabo de que en esa relación interna se determinen los grados exactos de culpa a los fines de uno u otro obtener reembolso directo en proporción a esa responsabilidad.

## Negligencia del hospital

La negligencia del hospital se configura por la acción y omisión en varios aspectos. Veamos.

### A. *Omisión en tomar los signos vitales*

Una de las complicaciones más serias de las adenotonsilectomías son las hemorragias. G. M. English, *Otolaryngology,* Harper & Row, 1977, Vol. 3, Cap. 28, págs. 18–23; 6 *Lawyer's Medical Cyclopedia,* Sec. 40.15, pág. 110 (1975); Basharat Jazbi, *Pediatric Otorhinolaryngology: Tonsillec-*

*tomy and Adenoidictomy: A Controversial Problem*, New York, Appleton Century-Crafts, Cap. 23, 1980, pág. 249. Pueden ser primarias, esto es, que ocurren durante o inmediatamente después de la cirugía. Se consideran muy peligrosas. Afortunadamente no son frecuentes. Los estudios revelan una incidencia baja que oscila entre menos de 1% hasta 1.4%. Paparella & Shumrick, *Otolaryngology*, Philadelphia, W. B. Saunder Co., 1980, Vol. III, pág. 2297. La otra categoría reconocida es la secundaria o tardía. De ordinario se produce entre el quinto y décimo día post operatorio. "Una hemorragia tardía raramente es peligrosa, salvo que se descuide, en cuyo caso puede ser fatal." DeWeese & Saunders, *Textbook of Otolaryngology, Ch. 4, The Tonsils and Adenoids*, St. Louis, C. V. Mosby Co., 1977, pág. 80; Havener-Saunders-Keith-Prescott, *Nursing Care in Eye, Ear, Nose & Throat Disorders*, St. Louis, C. V. Mosby Co., 1974, pág. 197.

■ Las hemorragias a su vez pueden ser mortales o exponer a los pacientes a graves riesgos, tales como estados de shock —Paparella & Shumrick, *op. cit.*; 4 *Lawyer's Medical Cyclopedia*, Sec. 30.8(a), pág. 184 (1975)—; anoxias cerebrales —R. N. Gray, 3 *Attorney's Textbook of Medicine*, Sec. 58.91(4a), pág. 58-162 (1985)—; y fallos cardíacos al aplicar anestesia —3B *Lawyer's Medical Cyclopedia*, Sec. 25.7, pág. 296 (1983). Para saber con precisión las condiciones en que se encuentra una persona que ha sufrido una hemorragia, diagnosticar y ofrecer tratamiento adecuado, es imprescindible que se realicen análisis de laboratorio y se tomen continuamente los signos vitales del paciente, especialmente su presión sanguínea. Rambo & Wood, *Nursing Skills for Clinical Practice*, Philadelphia, W. B. Saunders Co., 1982, pág. 426; 4 *Lawyer's Medical Cyclopedia*, Sec. 30.7(c), pág. 183 (1975). Ello se explica. Al experimentar pérdida de sangre, todo cuerpo humano va ofreciendo unos cambios físicos que sirven de mensajes a través de sus sistemas vascular, endocrínico y metabólico.

A pesar de que el niño Robertito llegó en estado de emergencia —se veía pálido— con un historial de hemorragia severa luego de ser sometido a este tipo de operación, el hospital incumplió con esta norma básica que exige la práctica excelente y diligente de la medicina. De haber tomado los signos vitales, el hospital hubiera estado en mejor posición de detectar antes la condición grave y de marcado deterioro del niño, y actuar sin tardanza para aplicar el tratamiento requerido, inclusive adelantar la transfusión de sangre. "Cuando existe pérdida de mucha sangre, el pulso se acelera y el niño se ve pálido." Havener-Saunders-Keith-Prescott, *op. cit.*, pág. 199.

Sobre este aspecto el tribunal de instancia determinó que esta omisión fue "grave pues esto pudo haber ayudado a decidir qué medidas urgentes tomar con el paciente". Coincidimos.

B. *Posposición y tardanza de la transfusión*

■ Además de incurrir en la negligencia antes expuesta, el personal del hospital incumplió una orden médica legítima, apropiada, clara y terminante. La misma exigía la administración inmediata de sangre a un niño de tierna edad en estado de gravedad. Se ordenó la transfusión *STAT*, abreviatura de *Statim*, que significa de inmediato, sin dilación. *Dorland's Illustrated Medical Dictionary*, 23 ed., Philadelphia, W. B. Saunders Co., 1957, pág. 1298; J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, New York, Matthew Bender Press, 1985, pág. S-166.(4)·

En los hospitales del país las enfermeras y el resto del personal paramédico tienen el ineludible deber de realizar y llevar a cabo, con la premura requerida y a tono con las cir-

---

(4) El carácter perentorio queda demostrado durante la operación quirúrgica de la tarde. Al ocurrir el paro cardíaco, se ordenó al personal del hospital una prueba de sangre con la palabra *STAT*, la misma utilizada en la orden de la mañana.

cunstancias particulares de cada paciente, las órdenes médicas. D. G. Warren, *Problems in Hospital Law*, Maryland, Aspen Systems Corp., 1981, págs. 71-78; Notter-Spalding, *Professional Nursing: Foundations, Perspective & Relationship*, Philadelphia, J. B. Lippincott Co., 1976, págs. 47-51; Creighton, *Law Every Nurse Should Know*, Philadelphia, W. B. Saunders Co., 1981, págs. 47-51.

Sin embargo, ante el tribunal de instancia y este foro, el hospital justifica su incumplimiento al explicar que la glucosa Ringer Lactate era un sustituto de la sangre, y que por tanto, no era necesaria la transfusión inmediata. Aduce, además, que la sangre se administra en el piso y no en la Sala de Emergencia, salvo en casos de vida o muerte, y ello luego del médico de cabecera haber llenado un formulario que lo libera de responsabilidad.

No tiene razón. Aunque teóricamente se admite que puede ser un sustituto, no compartimos el criterio de los peritos de que en este caso, la glucosa sustituyó, hizo las veces de la transfusión o redujo su urgencia. Primero, la orden terminante del médico Cintrón Ortiz es el mejor juicio pericial contra esa tesis. La misma representa el discernimiento del facultativo que allí, en el momento oportuno, examinó al paciente. Contenía el tratamiento a seguir ante un diagnóstico concreto. Las autoridades médicas coinciden que en caso de hemorragia grave, luego de practicada una adenotonsilectomía, lo recomendable es la administración inmediata de transfusión para restaurar el volumen de sangre circulante. English Gerard, *Otolaryngology, op. cit.*, págs. 46-47; Jasby, *op. cit.*, pág. 250; DeWeese & Saunders, *op. cit.*, pág. 80.

Esa determinación y orden apremiante la efectuó dicho galeno a pesar de que anteriormente la doctora Feliciano había recetado la glucosa. De ello sólo podemos inferir que si la ordenó era porque, según su mejor criterio, la glucosa no era suficiente para compensar el desangramiento. Al adoptar ese curso de acción, el cuadro médico ante sí era más

completo. Ya tenía el análisis de la hemoglobina y hematocritos. Y segundo, el lamentable desenlace destruye esa postura a posteriori pericial. Lo menos que podemos afirmar es que la glucosa, ni fue buen sustituto, como tampoco redujo la urgencia en la transfusión.

En estas circunstancias, es ineludible concluir que el personal paramédico del hospital, sin destrezas ni autoridad alguna en diagnóstico y tratamiento, prácticamente cambió la orden médica al administrar solamente la glucosa e irrazonablemente posponer la transfusión.

Tampoco es eximente de responsabilidad los argumentos basados en la reglamentación del hospital disponiendo que las transfusiones se administren en el piso y no en la Sala de Emergencia, salvo en casos de vida o muerte, y ello luego de obtener la firma de un relevo de responsabilidad por el médico que la ordena. Primero, notamos que la posposición de la transfusión no estuvo basada en una determinación previa del personal médico del hospital de si se trataba de un caso de vida o muerte, sino en una simple cuestión de lugar. Desde que el niño llegó es incuestionable que presentaba un caso claro de emergencia. Bastaba con que se tomaran medidas para suministrar la sangre en la Sala de Emergencia o que se instalara al menor rápidamente en un piso, trámite que debió tomar poco tiempo. Segundo, resulta cuestionable la declaración en el juicio del doctor Cintrón Ortiz de que ordenó la transfusión para ponerse en la habitación una vez el niño fuera ingresado y no en la Sala de Emergencia. Los términos de su misma orden aclaran la cuestión. Escuetamente requirió transfusión *inmediata* (*STAT*). Bajo esta premisa nos preguntamos, ¿cómo condicionar un tratamiento tan crucial y la vida del paciente a la disponibilidad de una habitación? Tercero, quedó establecido que se tardaron más de dos horas y media en trasladar al niño de la Sala de Emergencia a una habitación. Luego les tomó casi una hora más, desde que llegó al piso, para comenzar la transfusión. Esta situación se agrava si toma-

mos en cuenta que la dosis tardaba dos horas en bajar al organismo.

También es insostenible la pretensión de que por no haberse llenado un formulario de relevo se pospusiera el cumplimiento de la orden médica.

■ El derecho moderno ha superado la magia atribuida a este tipo de relevo o dispensa de responsabilidad anticipada. Se trata de documentos de adhesión en que la libertad de contratación y consentimiento de una de las partes se reduce al mínimo. La trayectoria jurisprudencial se ha encargado de situarlos en su correcta perspectiva, restándole importancia y eficacia jurídica en ciertas situaciones. *Chico* v. *Editorial Ponce, Inc.*, 101 D.P.R. 759, 778–779 (1973); *Cabrera* v. *Doval*, 76 D.P.R. 777 (1954); *Carrasquillo* v. *Am. Missionary Association*, 61 D.P.R. 867, 883–884 (1943). La responsabilidad civil hoy se examina y resuelve en función a lo esencial y no a la forma. En el campo de la medicina con mayor justificación. Está comprometida la salud, elemento axiológico de primer orden público. Sería ilógico y vulneraría principios ético-jurídicos una dispensa por falta de cuidado (deber de diligencia). Véase L. Diez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, págs. 716–720. Aún asumiendo la validez del pacto entre el médico y el hospital, frente al paciente sería *res inter alias acta*.

■ Todos estos argumentos denotan costumbres y prácticas institucionales rígidas e invariables que resultan inexcusables. Rechazamos que en los hospitales del país, incluyendo sus Salas de Emergencias, pueda prevalecer una rutina o un sistema administrativo inadecuado que implique desatender o posponer el tratamiento de pacientes en estado crónico, aumentando el riesgo y peligro de sus vidas.

Finalmente, el hospital alega que hacer un análisis de incompatibilidad de sangre y obtener el tipo correspondiente toma varias horas. Sin embargo, no desfiló prueba alguna que ilustrara que este análisis o la carencia del tipo de san-

gre en las facilidades del hospital fuera la causa de la demo-
ra. De ordinario, el análisis de incompatibilidad requiere de
20 a 60 minutos. Petz & Swisher, *Clinical Practice of Blood
Transfusion*, Newport, Churchill Livingstone, 1981, pág.
402. Según hemos visto, todos los indicadores apuntan como
única causa para la dilación la costumbre burocrática de no
administrar una transfusión en la Sala de Emergencia sin
antes obtener un relevo del médico.

C. *Atención inadecuada del menor en ausencia del médico
de cabecera*

. La sentencia puntualiza una declaración del doctor
Cintrón Ortiz de que el menor no sangró en la Sala de
Emergencia sino hasta que él lo volvió a examinar a las
12:10 P.M. Sin embargo, lo cierto es que la hemorragia con-
tinuó, aunque en menor grado, durante el período de su
ausencia. A las 10:00 de la mañana el menor eliminó un
coágulo. Mientras estuvo en la habitación estuvo escupiendo
sangre. El propio galeno se percató de las manchas en la
sábana que cubría la cama y tan pronto llegó, fue llamado
porque estaba sangrando profusamente otra vez.

Coetáneamente, mientras el médico de cabecera no
estaba presente, el menor continuó en estado de gravedad.
Su ritmo había adquirido proporciones taquicárdicas y se
notaba pálido. ¿Qué gestiones hizo el hospital desde las 7:00
A.M. hasta las 11:45 A.M.? Se limitó a seguir una rutina.
Lenta, pasiva y negligentemente ejecutó unas órdenes médi-
cas dadas en o antes de las 7:00 de la mañana. Algunas no
las cumplió. Son ejemplos, la aplicación morosa de la trans-
fusión y el omitir anotar el signo vital del ritmo cardíaco,
hasta que fue trasladado a la habitación. Cuando el niño
escupió el cóagulo, se limitó a llamar al doctor Cintrón.
Cuando éste no tomó ninguna acción, persistieron en la ru-
tina. El hospital no actuó agresivamente como la situación
ameritaba en evitación de daños ulteriores a la salud del
paciente.

■ No se tomó la iniciativa de consultar o llamar a otro médico. El cuadro clínico de emergencia exigía que se asignara personal médico ante la ausencia prolongada del médico de cabecera, doctor Cintrón Ortiz. Un hospital no es una hospedería que se limita a ejecutar las órdenes de médicos que ejercen privilegios en sus facilidades. Como institución de salud tiene el deber de estar vigilante, y si necesario y en coordinación con los familiares, gestionar y proveer el servicio de otro médico que atienda aquellos pacientes de emergencia si el médico de cabecera no está disponible para brindar la atención requerida. Ninguna costumbre, práctica o norma de ética puede soslayar este deber. La profesión médica, personal paramédico y los hospitales existen para el bienestar de los pacientes, no viceversa.

■ Reiteradamente nos hemos pronunciado sobre el deber de los hospitales y médicos de ofrecer a sus pacientes la atención que satisfaga las exigencias generalmente reconocidas por la profesión médica a la luz de los medios modernos de comunicación y enseñanza. *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978); *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *González* v. *E.L.A.*, 104 D.P.R. 55 (1975); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973). En virtud del Art. 1803 del Código Civil —31 L.P.R.A. sec. 5142— equivalente a la responsabilidad vicaria, el incumplimiento de ese deber por el personal del hospital conlleva responsabilidad extracontractual de la institución hospitalaria frente al perjudicado. *Roses* v. *Juliá*, 67 D.P.R. 518 (1947). Ese enfoque se impone con mayor énfasis en las Salas de Emergencia. "El concepto emergencia denota una combinación de circunstancias que necesariamente requieren un inmediato curso de acción o remedio. . . . Conlleva acción rápida en evitación de la muerte del lesionado o grave complicación a su salud." *Márquez Alfonso* v. *F.S.E.*, 105 D.P.R.

322, 328 (1976). Véase L. S. Powers, *Hospital Emergency Service and the Open Door*, 66 Mich. L. Rev. 1455 (1968).

*Negligencia atribuible al médico de cabecera doctor Cintrón Ortiz*

"Es inmensa la responsabilidad de operar un menor." Scott-Browns, *Diseases of the Ear, Nose and Throat*, 3ra ed., Philadelphia, J. B. Lippincott Co., 1971, Vol. 4, pág. 119.

Desde que el doctor Cintrón Ortiz fue llamado a su residencia en horas tempranas de la mañana por personal del hospital para comunicarle la condición de Robertito, dió la impresión de estar presionado o más interesado en efectuar las otras cinco operaciones selectivas que iba a realizar en el Hospital San Lucas. Así ordenó que lo trasladaran a dicho hospital, pero luego recapacitó e indicó que permaneciera en Damas. Posteriormente llegó al hospital y a pesar de que constató y diagnosticó una hemorragia tardía (*late bleeding*) —4 días desde la operación— y que no pudo determinar su origen, optó por ordenar la transfusión y marcharse a realizar las cinco operaciones rutinarias pendientes en el San Lucas. No se demostró que éstas fueran de emergencia y colocaran al galeno en la encrucijada de tener que escoger entre dos situaciones que presentaban estados legítimos de necesidad.

Ante el cuadro clínico previamente descrito, el deber del médico que antes operó al niño, era permanecer a su lado o relativamente accesible en todo momento para así estar en condiciones de supervisar el cumplimiento de sus órdenes, y aplicar el tratamiento rápido, adecuado y recomendado en casos de hemorragia grave, a saber cirugía inmediata y así evitar serio menoscabo a la salud. Gray, 1B *Attorney's Textbook of Medicine*, Sec. 10B. 35(5), pág. 10B-24; A. Roddley Holder, *Medical Malpractice Law*, 2da ed., New York, John Wiley & Sons, 1975, pág. 124.

Aún a las 10:00 A.M. cuando le fue notificado que Robertito escupió un coágulo, continuaba sangrando, tenía taqui-

cardia y estaba pálido, pudo muy bien posponer la última operación para acudir a atenderlo. No lo hizo. No puede rehuir la responsabilidad al aducir que no conocía la gravedad de la situación. Era evidente (o debió serlo), que cuando el personal del Hospital de Damas decidió interrumpir sus labores fue porque la condición del menor realmente era en extremo alarmante y se había deteriorado. Ni siquiera inquirió qué síntomas presentaba. Tampoco cotejó si habían cumplido sus órdenes.

El éxito de un profesional no es fácil. Los grandes logros son la suma de muchísimos pequeños detalles. Ya evaluemos la conducta del doctor Cintrón Ortiz bajo la presión o fatiga resultante de esas cinco (5) cirugías, el efecto fue relegar a segundo plano el caso de Robertito. Su proceder reflejó una actitud de despreocupación. No tomó ninguna medida cuando le comunicaron que el menor había vomitado sangre. Preguntamos, ¿para qué entonces ordenó que observaran la posibilidad de sangramiento? No llamó, sugirió u ordenó localizaran otro médico que lo sustituyera.

La responsabilidad de un médico con su paciente no queda adecuadamente descargada con meramente dejar unas órdenes a cargo de otros sin cerciorarse, de algún modo, que sean cumplidas. Una vez asume la responsabilidad profesional, tiene el deber de diligentemente darle seguimiento y verificar si el hospital ha brindado el tratamiento prescrito a su paciente. En un estado de emergencia, como la hemorragia de Robertito, ese deber era continuo. Si está imposibilitado de brindar personalmente tal atención por otros quehaceres válidos de la profesión o razones personales de peso, su obligación es buscar y lograr que otro personal médico competente lo sustituya. Crawford & Moritz, *Doctor and Patient and the Law*, St. Louis, C. V. Mosby Co., 1971, págs. 138, 344–346, 374–375.

Contrario a lo resuelto por el tribunal de instancia, resolvemos que el demandado doctor Cintrón Ortiz incumplió los anteriores deberes. Aunque en menor proporción que

la del Hospital, incurrió en negligencia. Su actitud fue poco prudente; de dejadez y desinterés. No se conforma con las mejores prácticas de la medicina. Sobre estos extremos consúltense: W. G. Alton, Jr., *Malpractice*, Boston, Little, Brown & Co., 1977, págs. 31–37, 74–77; 1 *Lawyer's Medical Cyclopedia*, Secs. 2.2 y 2.3, págs. 49–51 (1981); C. T. Drechsler, *Liability of physician for lack of diligence in attending patient*, 57 A.L.R.2d 379, 421 (1958); *Reed* v. *Laughlin*, 332 Mo. 424, 58 S.W.2d 440 (1933); *Jackson* v. *Burton*, 226 Ala. 483, 147 So. 414 (1933); *Batenan* v. *Rosenberg*, 525 S.W.2d 753 (1975); *Johnson* v. *Vaughn*, 370 S.W.2d 591, 596 (1963).

■ En resumen, por una multiplicidad de acciones y omisiones, la observancia de una rutina, y el confiar el médico en las gestiones del hospital, y viceversa, un caso grave y de emergencia no fue debidamente atendido. Como veremos, el resultado final es un ser humano cuya vida ha quedado tronchada desde su corta edad. Por la negligencia combinada en la atención del niño Roberto E. Núñez Cruz responden el Hospital de Damas y el médico Heriberto Cintrón Ortiz. Ambos contribuyeron al fracaso del tratamiento.

## III

*Relación causal*

Réstanos examinar si se demostró causalidad entre los hechos negligentes expuestos, el paro cardíaco y el daño cerebral.

La sala de instancia expresó que no podía dictaminarla. Se apoyó en que todos los peritos atestaron que ello era materia de incumbencia divina ("sólo Dios sabe"). En el contexto utilizado, esa expresión equivale a exigir prueba de certeza matemática. Erró. "El juez no se mueve sobre materia sujeta a las inexorables leyes del cálculo matemático; el camino a recorrer entre la norma general y la solución concreta escapa a una mera operación calculadora, interpo-

niéndose algo tan heterogéneo como la apreciación del sujeto en todos sus matices o facetas y la propia personalidad del Juez. No ha de llegar, pues, a la certeza absoluta, pero tampoco le basta apoyarse en un terreno de simples probabilidades, con fundado temor de posible equivocación." F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, págs. 21–22.

▮▮▮ Nuestra jurisprudencia establece que no es necesario demostrar una única y exacta causa de daño. Basta que el actor pruebe, mediante preponderancia de evidencia, que la conducta negligente del demandado fue el factor que con mayor probabilidad lo causó. En casos de este género, hemos reconocido la dificultad de determinar, qué en efecto, con mayor probabilidad causó el daño, en particular cuando la práctica médica o clínica omitida no puede garantizar un resultado positivo. *Cruz* v. *Centro Médico de P.R.*, supra.

Cuantitativamente, la prueba pericial de la parte demandada —Dres. Orlando L. Vázquez Torres, Félix Cortés, Víctor Montes Jordán, José L. Jiménez Vélez y Ernesto Colón Yordán— fue a los efectos de que varios factores pudieron causar el paro cardíaco y como consecuencia la anoxia cerebral. Atestaron que la anestesia pudo ser. Y que nadie podía asegurar la verdadera causa ni si la demora en la transfusión de sangre la produjo. Sobre esas bases el tribunal de instancia determinó que no podía imputar a la conducta de los demandados los daños sufridos.

Por otro lado, el perito de los demandantes, doctor Pérez Valdés, declaró que estaban relacionados y eran previsibles. Con claridad expuso la dinámica fisiológica que lo precipitó. Veamos.

El trasfondo clínico de Robertito era uno de debilitamiento del sistema cardiovascular ante la pérdida profusa de sangre. La transfusión se aplicó tardíamente y demoraba en llegar al organismo una vez se comenzó. Ante el cuadro de pérdida masiva de sangre en un corto período de tiempo, el organismo alerta los mecanismos de defensa del sistema

618

cardiovascular. Así, el pulso se acelera y ocurre una vaso-
constricción —reducción de los vasos sanguíneos, venas y
arterias— de manera que circule una cantidad menor de
sangre y se produzca una presión arterial suficiente para
mantener su función. Entonces ocurre una reducción del
flujo sanguíneo a los órganos secundarios y se presenta el
síntoma de palidez. Aclaró que la palidez del menor, que
continuó acentuándose, al igual que la aceleración de su
pulso, eran signos de este fenómeno.

Al aplicarse, la anestesia provoca una apertura o dila-
tación de los vasos sanguíneos y arterias. El volumen de
sangre no es suficiente para llenar los conductos, la presión
arterial cae, la cantidad de sangre que llega al corazón es
insuficiente y se facilita el paro cardíaco. Dicho perito indicó
que varios factores contribuyen al paro cardíaco, pero que
no podía determinar el porcentaje en que cada uno contri-
buyó. "Eso, Dios nada más lo sabe." De lo anterior surge
meridianamente claro, que la tardanza en aplicar la trans-
fusión de sangre y el no controlar a tiempo la hemorragia
contribuyeron directa y sustancialmente al funcionamiento
irregular y deterioro del sistema cardiovascular de Rober-
tito. Esta explicación encuentra apoyo en las autoridades:
Petz & Swisher, *op. cit.*, págs. 426-428. "En un niño pe-
queño, cuyo volumen total de sangre es proporcionalmente
menor [al de un adulto], la pérdida rápida de sangre se torna
mucho más grave antes. Su mecanismo compensatorio está
más expuesto a fallar súbitamente y su corazón más suscep-
tible de detenerse por anoxia. Si el mecanismo natural
hemostático o la capacidad del transporte de oxígeno de la
sangre está también menoscabado, entonces el escenario está
preparado para el desastre." (Traducción nuestra.) Scott-
Brown, *op. cit.*, pág. 120. Ante la necesidad de aplicar anes-
tesia para la segunda cirugía la fragilidad de su condición y
la dinámica fisiológica aumentaron los riesgos. R. M. Smith,
*Anesthesia for Infants and Children*, St. Louis, C. V. Mosby
Co., 1980, págs. 494-495. ¡Qué duda cabe! La dilación y

omisión fueron factores principales que contribuyeron a desencadenar los eventos que culminaron en el paro cardíaco y anoxia cerebral, fenómenos enteramente previsibles para la ciencia. Lo corrobora el que días antes, Robertito tolerara sin ninguna dificultad o complicación la anestesia general y demás medicamentos en ocasión de la adenotonsilectomía.

## IV

A modo de epílogo, coincidimos con el ilustrado juez sentenciador de que la verdad absoluta, y su corolario de justicia perfecta, son cualidades exclusivas del Sumo Hacedor. Sin embargo, bajo las normas jurisprudenciales de evaluación de prueba, tenemos el convencimiento jurídico y la certeza moral de que se demostró satisfactoriamente que las conductas negligentes de los demandados fueron los factores que con mayor probabilidad causaron el daño.

El juez, "[h]a de propender hacia la *certeza moral,* excluyendo toda duda que razonablemente pudiera albergarse; para su logro son cualidades indispensables un estricto sentido de moralidad personal y una intensa cultura jurídica. De ahí que deba saturarse en la convicción de la necesidad de formar una *conciencia moral* adecuada, marco que dignifique y aureole su vida profesional; . . . Es la conciencia —escribe Peinador— la norma de la moralidad subjetiva, y, sin ella, la norma objetiva, que lo es la ley divina y humana, resulta prácticamente inoperante; una conciencia bien formada es la mejor garantía de una moralidad en todo conforme con los preceptos a que tiene que ajustarse la actividad del hombre, la general o la profesional. . . . Siempre sabrá prestar oídos, en última instancia, a la voz de la conciencia, verdadera pauta de moralidad difícilmente falible cuando la inteligencia está ilustrada por la ciencia y la voluntad disciplinada por la moral. Todos sabemos de las constantes y moduladas inflexiones de esta voz insobornable, fértil consejera, desinteresada amiga, a veces suavemente

tranquilizadora, en otras insistentemente admonitiva". (Escolios omitidos.) F. Soto Nieto, *op. cit.*, pág. 22.

*Se dictará sentencia que imponga responsabilidad solidaria a los demandados.* [5]

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión. El Juez Asociado Señor Torres Rigual no intervino.

---

[5] Este dictamen es sin menoscabo de cualquier acción en nivelación que pudieran los demandados deducir entre sí una vez satisfecha la sentencia.