| Sucesión Celia Pagán Berríos y otros<br><br>Peticionarios<br><br>v.<br><br>Universidad de Puerto Rico, Recinto de Ciencias Médicas y otros<br><br>Recurridos<br><br>v.<br><br>Administración de Servicios Médicos de Puerto Rico y otros<br><br>Tercero Demandados | Certiorari<br><br>2021 TSPR 21<br><br>206 DPR \_\_\_\_ |
| --- | --- |

Número del Caso: CC-2019-518

Fecha: 25 de febrero de 2021

Tribunal de Apelaciones:

    Panel VI

Abogado de la parte peticionaria:

    Lcdo. Gerardo L. Santiago Puig

Abogada de la parte recurrida:

    Lcda. Iris M. Muñiz Rodríguez

Materia: Sentencia con Opinión de Conformidad y Opinión Disidente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Sucesión Celia Pagán Berríos y otros<br><br>Peticionarios<br><br>v.<br><br>Universidad de Puerto Rico, Recinto Ciencias Médicas y otros<br><br>Recurridos<br><br>v.<br><br>Administración de Servicios Médicos de Puerto Rico y otros<br><br>Tercero Demandados | CC-2019-0518 | <u>Certiorari</u> |

SENTENCIA

San Juan, Puerto Rico, a 25 de febrero de 2021.

Evaluado y habiendo expedido el auto de *certiorari* presentado por la parte peticionaria, se revoca la sentencia del Tribunal de Apelaciones y se reinstala la sentencia emitida por el Tribunal de Primera Instancia.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una Opinión de Conformidad, a la que se unen la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Martínez Torres emitió una Opinión Disidente. La Jueza Asociada señora Pabón Charneco no interviene.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Sucesión Celia Pagán Berríos y otros<br><br>Peticionarios<br><br>v.<br><br>Universidad de Puerto Rico, Recinto Ciencias Médicas y otros<br><br>Recurridos<br><br>v.<br><br>Administración de Servicios Médicos de Puerto Rico y otros<br><br>Tercero Demandados | CC-2019-0518 | Certiorari |

Opinión de Conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ, a la que se unen la Jueza Presidenta ORONOZ RODRÍGUEZ y el Juez Asociado señor FELIBERTI CINTRÓN

San Juan, Puerto Rico, a 25 de febrero de 2021.

En la historia reciente de Puerto Rico, las consideraciones económicas y la crisis que confronta el sistema de salud pública, según reconocido en este caso por la propia parte recurrida, han sido factores innegables con repercusiones en la vida de los pacientes indigentes. Hoy nos enfrentamos a la invitación de pautar que la crisis admitida por la parte recurrida es un eximente de responsabilidad civil y una justificación legal para evadir el cumplimiento con los estándares de la profesión médica. Por entender que todas las

facilidades de salud, tanto públicas como privadas, tienen la obligación de cumplir con los estándares de la profesión médica, rechazo tal invitación y por el contrario estoy conforme con el curso de acción tomado por una mayoría de este Tribunal.

Veamos el trasfondo fáctico y procesal de la controversia ante nos.

**I**

La causa de acción en el presente caso surge como resultado del fallecimiento de la Sra. Sheila De Jesús Pagán el 2 de enero de 2013. Según surge de la demanda presentada por su madre, la Sra. Celia Pagán Berríos (señora Pagán Berríos), y su padre, el Sr. Luis Alberto De Jesús Padilla (señor De Jesús Padilla), y de los hechos probados por el foro de primera instancia, la Escuela de Medicina del Recinto de Ciencias Médicas de la Universidad de Puerto Rico (UPR) fue negligente al no brindar un tratamiento adecuado a su hija cuando ésta acudió a la Clínica de Ginecología-Oncológica (Clínica) con un diagnóstico de cáncer de ovario. Alegaron que pudo haberse evitado su muerte si le hubiesen realizado una cirugía de estadio oportunamente y no casi cuatro (4) meses después de haberse detectado su condición; cuando ya no era candidata a operación. Por estos hechos, los demandantes reclamaron una compensación monetaria por sus

sufrimientos y angustias mentales.[1] Además, presentaron una causa de acción heredada como únicos y universales herederos de su hija fallecida.

En su contestación a la demanda, la UPR admitió que maneja la Escuela de Medicina en el Recinto de Ciencias Médicas, entidad a la cual pertenece la Clínica. No obstante, negó la negligencia imputada. Al mismo tiempo, la UPR instó una demanda contra terceros para traer al pleito a la Administración de Servicios Médicos (ASEM), como dueño y administrador de las salas de operaciones utilizadas por la UPR, así como al Gobierno de Puerto Rico (Gobierno) por ser responsable de brindar asistencia médica y servicios de salud a las familias puertorriqueñas. Aun cuando la institución universitaria reconoció la necesidad de realizarle a la Sra. Sheila De Jesús Pagán una cirugía de estadio, aseguró que la tardanza en efectuarla no se debió a causas atribuibles a ésta, sino a los terceros demandados.

Con respecto al Gobierno, se emitió sentencia de paralización en virtud de la Ley PROMESA, 48 USC sec. 2101 et seq.[2] En cuanto a la ASEM, el Tribunal de Primera

---

[1] Instada la causa de acción, la demandante Pagán Berríos falleció y el Tribunal de Primera Instancia autorizó la correspondiente sustitución de parte. Así, la Sucesión de la señora Pagán Berríos quedó compuesta por su viudo y codemandante, De Jesús Padilla, y el hijo de éstos, Luis Alberto De Jesús Pagán.

[2] Apéndice D del recurso de certiorari, pág. 166.

Instancia dictó Sentencia Parcial para desestimar la reclamación en su contra por estar prescrita.[3]

Únicamente pendiente la reclamación contra la UPR, se celebró el juicio en su fondo. Surgió de la prueba presentada que el 28 de junio de 2012, la Sra. Sheila De Jesús Pagán fue sometida a una cirugía para la remoción de su ovario derecho.[4] La intervención estuvo a cargo del Dr. Edward Hernández Ramírez (doctor Hernández Ramírez), Ginecólogo en el Hospital San Lucas en Guayama. La prueba patológica del tejido removido arrojó que la paciente padecía de un adenocarcinoma endometrioide grado II (cáncer de ovario).[5]

Con los resultados de la patología y otros estudios, la paciente acudió el 6 de agosto de 2012 a la oficina privada del Dr. Luis Santos Reyes (doctor Santos Reyes), Ginecólogo-Oncólogo. Sin embargo, por no aceptar el plan médico del gobierno, el doctor Santos Reyes refirió a la Sra. Sheila De Jesús Pagán a la Clínica. Acompañó su referido con una carta que indicaba: "Favor de conceder cita **lo antes posible para cirugía**. La paciente tiene un diagnóstico de cáncer de ovario **posible estadio IA**. Gracias".[6]

---

[3]Íd., págs. 169-175.

[4]A la paciente también se le extirpó ese mismo día el apéndice. La operación estuvo a cargo del Dr. Roque Nido.

[5]Apéndice D del recurso de certiorari, pág. 278.

[6]Íd., pág. 327. (Énfasis suplido). El doctor la refirió también al Departamento de Ginecología General de Centro Médico con la siguiente recomendación: "Please evaluate for endometrial biopsy. The patient has a diagnosis of endometroid ovarian adenocarcinoma. 30%

El **8 de agosto de 2012**, la Sra. Sheila De Jesús Pagán visitó la Clínica donde fue atendida por la Dra. Sharee Umpierre Catinchi (doctora Umpierre Catinchi), Ginecóloga-Oncóloga y testigo de la UPR. Ese día, la doctora le practicó un examen pélvico, una biopsia de endometrio y un papanicolau. Además, instruyó a la paciente para que trajera las laminillas con el tejido de la biopsia que le habían realizado en junio de 2012, para ser analizada por los patólogos de la Clínica.

La próxima cita de la paciente fue el **29 de agosto de 2012.** Allí se le dio a conocer los resultados del papanicolau y de la biopsia de endometrio. El primero arrojó negativo, mientras que el segundo resultó en "moderate differentiated carcinoma with focal squamous metaplasia".[7] Es decir, cáncer de endometrio. Sin embargo, el resultado de las laminillas de la biopsia de ovario aún no estaba disponible.[8] Ante dicho cuadro clínico, se pautó la cirugía de estadio tentativamente para el **4 de diciembre de 2012.** Conforme a lo explicado por los testigos y peritos de las partes, una cirugía de esta naturaleza permite identificar la extensión de la enfermedad y, conforme a ello, el tratamiento adecuado para la paciente.

---

percent of this patient has uterine pathology. Thanks." Véase, Apéndice D del recurso de certiorari, pág. 326.

[7] Transcripción de la prueba oral de 6 de marzo de 2018, pág. 23. Transcripción de la prueba oral de 7 de marzo de 2018, pág. 30. Véase, Apéndice D del recurso de certiorari, pág. 276.

[8] Transcripción de la prueba oral de 7 de marzo de 2018, pág. 36.

El **12 de septiembre de 2012**, la paciente regresó a la Clínica para una visita de seguimiento. Todavía para esa fecha la Clínica no contaba con el resultado de la patología del tejido del ovario que había sido removido. Ese día no le realizaron ningún estudio. La cirugía calendarizada para el 4 de diciembre de 2012 fue confirmada. La doctora Umpierre Catinchi le dio instrucciones a la paciente para que acudiera a sala de emergencias si su condición empeoraba fuera de horas laborales. A tenor con el récord médico, la Sra. Sheila De Jesús Pagán fue orientada sobre la baja posibilidad de adelantar la cirugía.[9] Se le dio la opción de ser referida a un ginecólogo-oncólogo privado para una posible intervención más temprana.[10] Sin embargo, durante el contrainterrogatorio, la doctora Umpierre Catinchi declaró que no recuerda haber estado presente cuando presuntamente le dieron dicha información a la paciente.[11]

El **17 de octubre de 2012**, la Sra. Sheila De Jesús Pagán acudió por última vez a la Clínica para una cita de seguimiento. Finalmente, tras una gestión de la Clínica, obtuvieron los resultados de la patología del ovario, los cuales estaban listos desde el 5 de septiembre del mismo año.[12] No obstante, **la Clínica no había hecho gestión**

---

[9]Apéndice D del recurso de <u>certiorari</u>, págs. 249-250.
[10]Íd.
[11]Transcripción de la prueba oral de 7 de marzo de 2018, pág. 74.
[12]Transcripción de la prueba oral de 8 de marzo de 2018, pág. 31. Véase, Apéndice D del recurso de <u>certiorari</u>, pág. 279.

**alguna para procurarlos hasta ese momento.**[13] La patología confirmó el resultado original: cáncer de ovario, grado II.[14] De otra parte, la Sra. Sheila De Jesús Pagán le indicó a la doctora Umpierre Catinchi que la aquejaba un dolor intenso e intermitente en el lado izquierdo de la pelvis.[15] **Conforme el récord médico, no se le practicó examen físico alguno a la paciente, ni se le realizó prueba de ningún tipo para identificar la procedencia del dolor.**[16]

En espera de la operación, la Sra. Sheila De Jesús Pagán acudió en al menos siete (7) ocasiones a salas de emergencias. Cuatro (4) de estas visitas fueron a la Sala de Emergencias del Hospital Universitario de Adultos (UDH) en Centro Médico. La primera visita fue el 8 de noviembre de 2012. La paciente se quejó de un dolor pélvico en el lado izquierdo con radiación en la espalda, de intensidad 8/10.[17] Fue atendida por una residente de ginecología quien describió un cérvix difícil de visualizar, una secreción sanguinolenta, un útero y aneja izquierda difícil de palpar debido a la obesidad de la

---

[13]Transcripción de la prueba oral de 8 de marzo de 2018, págs. 31-32.

[14]Apéndice D del recurso de <u>certiorari</u>, pág. 279.

[15]Transcripción de la prueba oral de 5 de marzo de 2018, pág. 86

[16]Íd., págs. 87 y 89. Véase, Apéndice D del recurso de <u>certiorari</u>, pág. 262.

[17]Transcripción de la prueba oral de 5 de marzo de 2018, pág. 99. Véase, Apéndice D del recurso de <u>certiorari</u>, pág. 1170.

paciente.[18] Ese día no se le realizó estudio radiológico ninguno.

El 22 de noviembre de 2012, ésta acudió otra vez a la sala de emergencias de la UDH con dolor pélvico 10/10.[19] Describió el dolor como punzante, quemante, ardor, latente, sofocante.[20] Se le realizó un examen pélvico y se identificó por primera vez una masa pélvica de 18 c.m.[21] No se le realizó examen radiológico alguno.

La Sra. Sheila De Jesús Pagán regresó dos (2) días después a la sala de emergencias con dolor pélvico 10/10. Únicamente le tomaron los signos vitales, reflejando un pulso de taquicardia.[22] No se le hizo examen físico. La última visita a la sala de emergencias fue el 26 de noviembre de 2012 con la misma queja de dolor pélvico. En esta ocasión se le realizaron pruebas de sangre y de orina.

La doctora Umpierre Catinchi declaró que la Sala de Emergencias de la UDH y la Clínica no comparten un sistema de información electrónico sobre los expedientes de los pacientes.[23] Sobre el personal ginecólogo de la Sala de Emergencias, la doctora aseguró que no

---

[18]Íd.

[19]Apéndice D del recurso de certiorari, pág. 1148.

[20]Íd., pág. 1154.

[21]Transcripción de la prueba oral de 5 de marzo de 2018, pág. 104. Véase, Apéndice D del recurso de certiorari, pág. 1148.

[22]Transcripción de la prueba oral de 5 de marzo de 2018, págs. 106 – 107. Véase, Apéndice D del recurso de certiorari, pág. 1126.

[23]Transcripción de la prueba oral de 7 de marzo de 2018, págs. 16 y 62.

pertenecían a la Clínica, sino que eran contratados por el hospital.[24]

Llegado el día de la cirugía, el 4 de diciembre de 2012, la doctora Umpierre Catinchi le realizó a la Sra. Sheila De Jesús Pagán un examen pélvico bajo anestesia. En ese momento, advino en conocimiento de que ésta había desarrollado una masa en el cuello de la matriz con extensión a la vagina y al área del útero-sacro derecho.[25] La paciente ya no era candidata a operación. Por tanto, no se le pudo realizar la cirugía de estadio.[26] Ante dicho cuadro clínico, se le realizó un CT Scan y un MRI. Entre otras cosas, el CT Scan reflejó masas en ambos lados de la pelvis. El 6 de diciembre de 2012, la Sra. Sheila De Jesús Pagán fue dada de alta con recomendación para un tratamiento neoadyuvante con quimioterapia y radioterapia.

No obstante, sin que pudiera comenzar con el tratamiento, la Sra. Sheila De Jesús Pagán fue hospitalizada el 13 de diciembre de 2012 en el UDH, hasta el 2 de enero de 2013, cuando falleció. Su cuadro clínico: sepsis severa, hipocalcemia y fallo renal agudo.

En cuanto a lo sustantivo de la controversia que nos ocupa, los peritos de las partes coincidieron en que lo correcto era realizarle una cirugía de estadio a la Sra. Sheila De Jesús Pagán y, por tanto, conforme a la mejor

---

[24] Íd., pág. 62.
[25] Íd., pág. 56.
[26] Íd., págs. 56-57.

práctica de la medicina.[27] En cuanto al tiempo de espera, la Dra. Carmen Ortiz Roque (doctora Ortiz Roque) – Ginecóloga-Obstetra y Uroginecóloga y perito de la parte demandante – afirmó que la cirugía debe realizarse dentro de los sesenta y dos (62) días siguientes al diagnóstico.[28] Por su parte, el Dr. Jesús Rodríguez Arroyo (doctor Rodríguez Arroyo), Ginecólogo-Oncólogo y perito de la UPR, testificó que lo correcto es intervenir a la paciente en un periodo de seis (6) semanas, contadas desde que se obtienen los resultados de todas las pruebas.[29] Finalmente, la Dra. Josefina Esther Romaguera Agrait (doctora Romaguera Agrait) – Ginecóloga y testigo de la UPR - dijo que para cualquier tipo de cáncer, una cirugía de estadio debe ser realizada dentro de noventa (90) días.[30]

Por otra parte, se estableció que, para la fecha de los hechos, en Puerto Rico solo existían tres (3) ginecólogos-oncólogos: el doctor Rodríguez Arroyo, la doctora Umpierre Catinchi y el doctor Santos Reyes. Los dos últimos trabajaban para la Clínica. En cuanto al aspecto administrativo de la Clínica, se atendían alrededor de cuarenta (40) a setenta (70) pacientes todos

---

[27]Transcripción de la prueba oral de 5 de marzo de 2018, págs. 66-67. Transcripción de la prueba oral de 6 de marzo de 2018, pág. 14. Transcripción de la prueba oral de 9 de marzo de 2018, págs. 65-66.
[28]Transcripción de la prueba oral de 5 de marzo de 2018, pág. 75.
[29]Transcripción de la prueba oral de 9 de marzo de 2018, págs. 71-73, 146.
[30]Transcripción de la prueba oral de 8 de marzo de 2018, págs. 39 y 41.

los miércoles. Los lunes y algunos martes, eran los días designados para operaciones ginecológicas.[31] Realizaban un máximo de dos (2) operaciones por día. La doctora Umpierre Catinchi explicó que ello es así porque el proceso de preparación entre una operación y otra es extenso, dado que el equipo es limitado y tiene que pasar por un proceso de limpieza antes de volver a utilizarlo, entre otras cosas.[32] Para el año 2012, el tiempo de espera para una cirugía rondaba entre los tres (3) a cuatro (4) meses.[33] Las cirugías se calendarizan por orden de llegada.[34] La doctora Umpierre Catinchi admitió que una fecha tan lejana para realizar una cirugía de estadio no es lo óptimo.[35] No obstante, adujo que ello está fuera de su control, por lo que no podían operar a la Sra. Sheila De Jesús Pagán antes de lo programado.

En esa línea, la doctora Romaguera Agrait declaró que parte de los problemas para aumentar el volumen de cirugías era la infraestructura. Se refirió particularmente a la falta de fondos para contratar más personal y comprar más equipo.[36] **Aseguró que eso no es un problema nuevo, sino que viene ocurriendo hace más de**

---

[31]Transcripción de la prueba oral de 7 de marzo de 2018, pág. 17.
[32]Íd.
[33]Íd., pág. 38.
[34]Íd., págs. 38 y 43. Transcripción de la prueba oral de 8 de marzo de 2018, págs. 20-21.
[35]Transcripción de la prueba oral de 7 de marzo de 2018, págs. 51-52.
[36]Transcripción de la prueba oral de 8 de marzo de 2018, págs. 36-38.

**treinta y ocho (38) años y, que tal situación no cumple con el "standard of care".**[37]

Por otro lado, el doctor Rodríguez Arroyo declaró que, en su práctica privada, atiende alrededor de setenta (70) pacientes tres (3) veces en semana. Opera dos (2) días a la semana, entre siete (7) a ocho (8) pacientes diarios. No solo eso, sino que tiene el beneficio de controlar y/o manipular el calendario de las cirugías. Además, el doctor Rodríguez Arroyo testificó que tiene como práctica llamar al patólogo para requerir los resultados de las biopsias en caso de que no las hubiese recibido antes.

Aquilatada la prueba, el Tribunal de Primera Instancia dictó Sentencia declarando ha lugar la demanda. La juzgadora de los hechos concluyó que la prueba demostró que el reporte de la biopsia de ovario estuvo disponible desde el 5 de septiembre de 2012; por lo que la parte demandada falló al no pautar la cirugía de estadio en o antes del 15 de octubre de 2012, conforme al término de seis (6) semanas testificado por el perito de la UPR. El tribunal inferior sumó a su dictamen el hecho de que los médicos de la UPR no realizaron gestión alguna para obtener los resultados de la biopsia oportunamente, en detrimento de la condición de la Sra. Sheila De Jesús Pagán. Por tanto, el Tribunal de Primera Instancia concluyó que fue el tiempo de espera por la cirugía lo

---

[37] Íd., págs. 37-38.

que provocó que la condición progresara a tal punto que, para el 4 de diciembre de 2012, ya la paciente no era candidata para una cirugía de estadio.

Asimismo, resolvió que la UPR incurrió en responsabilidad al no realizarle estudio radiológico alguno a la Sra. Sheila de Jesús Pagán durante las cuatro (4) ocasiones que visitó la Sala de Emergencias del UDH quejándose de dolor. Conforme a la apreciación del foro primario, la prueba demostró que, de habérselos realizado oportunamente, los médicos hubiesen conocido que la enfermedad progresaba. En tal caso, hubieran intervenido inmediatamente a la paciente con gran probabilidad de alcanzar un porciento mayor de sobrevivencia.

Por otra parte, respecto a la contención de la UPR de que no tiene el control de las fechas para operar, siendo el tiempo promedio de espera de tres (3) a cuatro (4) meses, el Tribunal de Primera Instancia dictaminó:

> La prueba pericial del demandado siempre indicó que el tiempo razonable para operar una persona con las condiciones de Sheila era de no más de seis semanas. Si ese término es lo que cumple con el estándar de la medicina, la UPR no puede refugiarse en la excusa de que no tenía el control del itinerario de fechas disponibles para cirugía.
>
> […]
>
> Si dicha institución, a tenor con los Planes de Práctica Universitaria Intramural, abre sus puertas a la comunidad para ofrecer su pericia a los pacientes que allí acuden, al tiempo que entrena a otros médicos, no puede indicar que ello lo hace de manera incorrecta e incumpliendo con el estándar de la medicina, adjudicándole esa responsabilidad a un tercero, bajo la excusa de que no tiene el control de las Salas de

Operaciones o no cuenta con personal suficiente. No podemos olvidar que la Dra. Romaguera testificó que la UPR está consciente de que al brindar sus servicios en la Clínica no lo hace de manera óptima, [sino] contrario al estándar, y que ello ha sido así durante los más de 30 años que lleva con la UPR. Por tanto, si el demandado ofrece sus servicios consciente de lo anterior, ello se aparta de la mejor práctica de la medicina.[38]

En virtud de lo anterior, el Tribunal de Primera Instancia condenó a la UPR al pago de una indemnización económica a favor de la parte demandante.

Inconforme, la UPR presentó una solicitud de determinaciones de hechos adicionales y conclusiones de derecho, acompañada de una moción de reconsideración. Mediante Resolución de 14 de mayo de 2018, el foro primario acogió veintitrés (23) de las treinta y ocho (38) determinaciones de hechos propuestas por el recurrido y declaró no ha lugar la solicitud de reconsideración.[39]

Así las cosas, la UPR acudió al Tribunal de Apelaciones mediante un recurso de apelación. Allí, cuestionó la credibilidad que le mereció al juzgador de los hechos el testimonio de la doctora Ortiz Roque sobre el testimonio de reconocidos especialistas en la materia. A ello, añadió que la parte demandante no logró establecer la relación causal entre el alegado acto de impericia médica y los daños sufridos. Ello, amparado en que el tribunal recurrido no tomó en consideración la prueba presentada por la UPR que evidenciaba la crisis de médicos

---

[38]Apéndice D del recurso de certiorari, pág. 201.
[39]Íd., pág. 248.

ginecólogos-oncólogos en Puerto Rico. Por último, la institución universitaria alegó que el tribunal primario incidió al conceder una partida de daños por la causa heredada, cuando nunca se realizó una declaratoria de herederos de la Sra. Sheila De Jesús Pagán. La parte demandante sostuvo lo opuesto.

Ponderados los argumentos, el Tribunal de Apelaciones revocó la decisión del Tribunal de Primera Instancia. En primer lugar, le dio la razón a la UPR en cuanto a que el foro recurrido erró al darle mayor valor probatorio a la opinión de la doctora Ortiz Roque sobre las opiniones de los peritos de la parte demandada. Sin entrar a discutir los testimonios de las partes, su análisis se sostuvo en la presunta razón inexplicable del Tribunal de Primera Instancia de no incluir como parte de sus determinaciones de hechos las credenciales académicas y profesionales de la doctora Umpierre Catinchi. La comparación de las credenciales de esta última y de los demás testigos de la parte demandada con las de la perito de la parte demandante, abonó a su dictamen.

En segundo lugar, el Tribunal de Apelaciones tomó conocimiento judicial de la crisis en Puerto Rico sobre la escasez de ginecólogos-oncólogos. Razonó que "esa crisis es evidente y es pertinente a uno de los elementos medulares de toda demanda de daños y perjuicios extracontractuales: la culpa o negligencia".[40]

---

[40] Íd., pág. 33.

Particularmente, cuando para el periodo de 2012-2013 en Puerto Rico solo existían tres sub-especialistas en el área de ginecología-oncológica. Con ello en mente, el foro apelativo intermedio avaló las declaraciones de la doctora Umpierre Catinchi en cuanto a que la mayoría de los pacientes que asisten a la Clínica requieren de una cirugía para un diagnóstico apropiado, que éstas son extensas y solo pueden ser intervenidos entre dos a tres pacientes por día de operación.

Por último, el Tribunal de Apelaciones concluyó que la parte demandante no probó que la Escuela de Medicina de la UPR, ni los médicos interventores, fallaron en brindar un tratamiento médico adecuado a la Sra. Sheila De Jesús Pagán. "Aunque a los tribunales les compete determinar en cada caso particular si la actuación médica cumple con los estándares profesionales, no es nuestra función imponerle cambiar las prácticas seguidas en el momento en que atendieron a la señora Sheila de Jesús Pagán".[41]

En desacuerdo, la parte peticionaria acude ante este Tribunal solicitando que revoquemos el dictamen aludido. Le imputa al Tribunal de Apelaciones la comisión de los siguientes errores:

> Erró el Tribunal de Apelaciones al concluir que la parte demandante no probó que la Escuela de Medicina de la UPR ni los médicos interventores fallaron en brindar un tratamiento médico adecuado a la paciente.

> Erró el TA en su Sentencia al resolver que el TPI había abusado de su discreción al no

---

[41]Íd., pág. 31.

permitir que la recurrida presentara las credenciales de la Dra. Sharee Umpierre en la vista en su fondo.

Expedido el recurso ante nuestra consideración y con el beneficio de la comparecencia de ambas partes, procede su solución.

## II

### A.

Para la fecha de los hechos, la responsabilidad civil de un facultativo médico por actos de impericia o negligencia médica emanaba del entonces Artículo 1802 del Código Civil de 1930. 31 LPRA sec. 5141. Véase, además, Rodríguez et al. v. Hospital et al., 186 DPR 889 (2012). Dicho articulado postula que el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. Íd.[42] Así, toda persona que inste una acción en daños por impericia médica está obligada a demostrar: (1) la ocurrencia de un acto médico culposo o negligente; (2) la producción de un daño real y (3) la relación causal entre el acto médico y el daño sufrido. Soto Cabral v. E.L.A., 138 DPR 298, 309 (1995).

Lo anterior implica que, para que el demandante prospere en su causa de acción, no está obligado a demostrar una única y exacta causa del daño, sino que

---

[42] El Artículo 1536 del Código Civil de 2020 dispone de similar manera al leer: "La persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo".

basta con demostrar mediante preponderancia de la prueba que la acción negligente del médico fue el factor que con mayor probabilidad ocasionó el daño y establecer, además, el vínculo causal requerido por el Artículo 1802 del Código Civil, supra. Blás v. Hosp. Guadalupe, 146 DPR 267, 322 (1998); Rodríguez Crespo v. Hernández, 121 DPR 639, 650 (1988); Ríos Ruiz v. Mark, 119 DPR 816 (1987).

Ahora bien, tengamos en cuenta que la negligencia del médico no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. Rodríguez Crespo v. Hernández, supra, pág. 650. Tampoco se considera suficiente, alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su responsabilidad profesional. Ramos, Escobales v. García, González, 134 DPR 969, 976 (1995); Vda. de López v. E.L.A, 104 DPR 178 (1975). Hemos dicho que la relación de causalidad entre el daño y el acto negligente no puede establecerse por meras conjeturas o suposiciones. Santiago Otero v. Méndez, 135 DPR 540, 549 (1994). Lo anterior, toda vez que un médico no puede garantizar un resultado favorable en toda intervención. Medina Santiago v. Vélez, 120 DPR 380, 385 (1988).

En cuanto a la norma mínima de cuidado exigible, se requiere que el médico brinde a sus pacientes aquella atención médica que, "a la luz de los modernos medios de comunicación y enseñanza y, conforme al estado de

conocimiento de la ciencia y práctica prevaleciente de la medicina, satisfaga las exigencias generalmente reconocidos por la propia profesión médica". Arrieta v. De la Vega, 165 DPR 538, 549 (2005); Flores Ramírez v. Maldonado, 138 DPR 722, 732 (1995); Rodríguez Crespo v. Hernández, supra, págs. 648-649; Pérez Torres v. Blaudell Ramos, 120 DPR 295, 302 (1988).

Además, hemos reconocido que el médico posee discreción para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico, a tenor con las circunstancias personales del paciente. Arrieta v. De la Vega, supra, pág. 549; Ramos, Escobales v. García, González, supra, pág. 975. De manera que, el médico está exento de responsabilidad civil si el tratamiento brindado a su paciente, aun cuando erróneo, está enmarcado dentro de los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica. Santiago Otero v. Méndez, supra, pág. 550; Pérez Torres v. Bladuell Ramos, supra.

En resumidas cuentas, para establecer un caso prima facie de impericia médica se tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y de cuidado médico aplicables a los médicos generalistas o especialistas; (2) que el demandado no cumplió con las referidas normas de tratamiento del paciente; y, (3) que el incumplimiento del médico fue la causa del daño

sufrido por el paciente. Arrieta v. De la Vega, supra, págs. 548-549; Medina Santiago v. Vélez, supra, pág. 385.

**B.**

De igual manera, hemos reconocido la responsabilidad de los hospitales en casos de negligencia médica, toda vez que éstos juegan un papel importante en el cuidado de la salud del paciente. Es decir, el deber del cuidado del paciente no sólo corresponde a su médico, sino al hospital como institución. M. Rivera Cruz & A. Valderrábano Wagner, Medicina para la impericia médica: Alternativas a los problemas que enfrenta el sistema, 41 Rev. Der. P.R. 295, 301 (2002). Ello, independientemente de que se trate de una institución hospitalaria pública o privada. Véase, Hernández v. Gobierno La Capital, 81 DPR 1031, 1037 (1960).

A diferencia de la clase médica, la responsabilidad de los hospitales se rige por el axioma de una persona "prudente y razonable". Esto quiere decir que los hospitales están obligados a ejercer el cuidado y las medidas previsoras que una persona razonablemente prudente desplegaría ante determinadas circunstancias y, ofrecer a sus pacientes la atención médica que su condición requiera. Blás v. Hosp. Guadalupe, supra, pág. 323. Dicho de otro modo, los hospitales le deben a sus pacientes aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. Márquez Vega v. Martínez Rosado, 116 DPR 397,

405 (1985). Siempre considerando la práctica generalmente reconocida por la profesión médica y sus avances. Blás v. Hosp. Guadalupe, supra, pág. 323; M. Rivera Cruz & A. Valderrábano Wagner, supra, pág. 299.

Cabe señalar que la responsabilidad de los hospitales en cuanto a la atención médica que deben prestar no es absoluta. Blás v. Hosp. Guadalupe, supra, pág. 324; Crespo v. H. R. Psychiatric Hospital, Inc., 114 DPR 796, 800 (1983); Hernández v. Gobierno La Capital, supra, pág. 1037. El deber de previsión exigido "no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino aquel que es probable que suceda y que llevaría a una persona a anticiparlo". Blás v. Hosp. Guadalupe, supra, pág. 324; Lozada v. E.L.A., 116 DPR 202, 215 (1985). De modo que el hospital será responsable si ocurre un daño que en las particulares circunstancias del caso pudo razonablemente haberse previsto y evitado. Íd.

Durante el transcurso de los años, hemos identificado distintos escenarios en los que las instituciones hospitalarias responden por los daños sufridos por el paciente. La responsabilidad de los hospitales puede darse en dos vertientes: (1) directa o (2) indirecta. Arts. 1802 y 1803 del Código Civil de 1930, 31 LPRA sec. 5141 y 5142. La responsabilidad directa de los hospitales estriba en su incumplimiento con el deber de: (1) seleccionar y retener médicos

competentes y supervisarlos en relación al cuidado de pacientes, Márquez Vega v. Martínez Rosado, supra, págs. 409-411; Pérez Cruz v. Hosp. La Concepción, 115 DPR 721, 732 (1984); (2) mantener seguras y adecuadas sus facilidades y equipos, Lozada v. E.L.A., supra; Blás v. Hosp. Guadalupe, supra; y (3) formular, adoptar y hacer cumplir reglas y políticas adecuadas para asegurar la calidad en el cuidado de sus pacientes. L. Sánchez Betances, Responsabilidad de los hospitales para con los pacientes, 36 Rev. Jur. UIPR 201, 207 (2002). Con respecto a este último escenario, los hospitales también responden por políticas institucionales que obstaculicen el cuidado de los pacientes. Fonseca et al. v. Hosp. HIMA, 184 DPR 281 (2012); Núñez v. Cintrón, 115 DPR 598 (1985).

En Núñez v. Cintrón, supra, un menor de cuatro (4) años llegó a sala de emergencias con una hemorragia. A las 7:00 a.m. el doctor que lo examinó ordenó le administraran una transfusión de sangre inmediatamente. Sin embargo, conforme a la política institucional del hospital, tal procedimiento no podía realizarse en la sala de emergencia, sino en piso, cuando el menor fuera trasladado a una habitación; y luego que el médico de cabecera llenase un formulario que lo liberara de responsabilidad. Así las cosas, no fue sino hasta las 10:45 a.m. que el personal del hospital había comenzado a administrarle la transfusión que había sido ordenada con

carácter de urgencia desde las 7:00 a.m. Para entonces ya era tarde, pues el menor sangraba continua e ininterrumpidamente, por lo que el doctor decidió operarlo para detener la hemorragia. Minutos más tarde, el menor sufrió anoxia cerebral como resultado de un paro cardíaco. El daño cerebral fue de naturaleza permanente.

Ante tales hechos, este Tribunal le impuso responsabilidad al hospital, en primer lugar, por no haber tomado los signos vitales del menor como correspondía. Segundo, y más importante aún, por el incumplimiento de su personal con la orden médica del doctor de transfundir al menor inmediatamente y, por tanto, **posponer** irrazonablemente la transfusión. Respecto a esto último, se cuestionó la pobre decisión del hospital de **condicionar** el acto de transfusión al lugar donde se administraría y al previo relevo de responsabilidad. Sobre esto, expresamos:

> Escuetamente requirió transfusión inmediata (STAT). Bajo esta premisa nos preguntamos, ¿cómo condicionar un tratamiento tan crucial y la vida del paciente a la disponibilidad de una habitación?
>
> […]
>
> También es insostenible la pretensión de que por no haberse llenado un formulario de relevo se pospusiera el cumplimiento de la orden médica. […]La responsabilidad civil hoy se examina y resuelve en función a lo esencial y no a la forma. En el campo de la medicina con mayor justificación. Está comprometida la salud, elemento axiológico de primer orden público. Sería ilógico y vulneraría principios ético-jurídicos una dispensa por falta de cuidado (deber de diligencia). (Cita omitida) […]

> Todos estos argumentos denotan costumbres y prácticas institucionales **rígidas e invariables que resultan inexcusables**. Rechazamos que en los hospitales del país, incluyendo sus Salas de Emergencias, pueda prevalecer **una rutina o un sistema administrativo inadecuado que implique desatender o posponer el tratamiento de pacientes en estado crónico**, aumentando el riesgo y peligro de sus vidas. (Énfasis suplido). Núñez v. Cintrón, supra, págs. 610-611.

Otro escenario en el cual el hospital incurre en negligencia directa se ha visto en otras jurisdicciones, cuando la institución falla en tener o implementar reglas adecuadas para la comunicación de información vital sobre el cuidado del paciente a otros que son, o serán, responsables de su tratamiento. M.M. Bertolet, Hospital Liability, Law and Practice, Nueva York, Practising Law Institute, 1987, pág. 261; Véase, Keene v. Methodist Hospital, 324 F. Supp. 233 (1971).

Por otra parte, la obligación indirecta radica en el principio de responsabilidad vicaria. En estos casos, los hospitales responden por las acciones u omisiones negligentes de sus empleados, particularmente, de las enfermeras y demás personal paramédico. Véase, Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 DPR 484, 512 (2009); Blas v. Hosp. Guadalupe, supra; Reyes v. Phoenix Assurance Co., 146 DPR 267, 307 (1998); Hernández v. Gobierno La Capital, supra; Núñez v. Cintrón, supra. Esta modalidad de responsabilidad también se da en aquellos casos donde se demuestre la aplicación de la doctrina de

autoridad aparente. L. Sánchez Betances, supra, págs. 223-227.

### C.

Desde los años 80, el Recinto de Ciencias Médicas de la UPR ha auspiciado los planes de práctica médica intramural. Dicho programa comenzó con la Escuela de Medicina y luego con la Escuela de Odontología. Certificación Número 123, 1996-97, Reglamento para la creación y administración de Planes de Práctica Universitaria Intramural en la Universidad de Puerto Rico. Sin embargo, la implantación de estos planes no era extensiva a todas las unidades del sistema universitario. Por ello, al cabo de los años y en vista del éxito y el progreso económico como incentivo para reclutar y retener a la facultad médica, la Asamblea Legislativa decidió enmendar la Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966, 18 LPRA sec. 601 et seq., para autorizar formalmente la integración de estos planes de práctica intramural a todas las unidades de la UPR. Íd.

En virtud de lo anterior, se promulgó la Ley Núm. 174 el 31 de agosto de 1996, 1996 LPR 174. Mediante dicha pieza legislativa se autorizó a la UPR, como órgano de la educación superior, a crear en todas sus unidades planes de práctica intramural universitaria. Art. 1 de la Ley Núm. 174-1996, supra. Este programa tiene como propósito: hacer disponible a la comunidad de Puerto Rico los

recursos humanos, la experiencia y los conocimientos del personal docente de la UPR; exponer a los estudiantes a un modelo de **práctica profesional eficiente, ético y moderno de alta calidad**; ofrecer alternativas a la facultad para obtener una retribución adicional; crear recursos económicos adicionales para facilitar el reclutamiento y la retención del personal docente; fortalecer el presupuesto institucional, entre otros. (Énfasis suplido). Exposición de Motivos de la Ley Núm. 174-1996, supra; véase, Rodríguez Ruiz v. Hosp. San Jorge, 169 DPR 850 (2007). Cada unidad del sistema establece la estructura de sus planes de práctica intramural universitaria en conformidad con el Reglamento aprobado por la Junta de Síndicos para esto. Art. 1 de la Ley Núm. 174-1996, supra.

En resumen, la práctica intramural puede emplearse para: (1) dar apoyo a investigaciones, entrenamientos y proyectos de servicio; (2) exponer a los estudiantes a modelos de práctica profesional; y (3) ampliar el potencial de los estudiantes y el profesorado. Universidad de Puerto Rico, Plan de Práctica Universitaria Intramural (PPUI),http://graduados.uprrp.edu/index.php?lang=es&option=com_content&view=article&id=218&Itemid=473(última visita, 5 de junio de 2020).

Obviamente, tal práctica educativa y profesional debe ser cónsona con el derecho de todo paciente a recibir

servicios de salud de la más alta calidad, consistente con los principios generalmente aceptados de la práctica de la medicina. Art. 4 de la Ley Núm. 194-2000, según enmendada, conocida como Carta de Derechos y Responsabilidades del Paciente, 24 LPRA sec. 3042.

**D.**

Por otra parte, es harto conocido que los foros apelativos deben deferencia a la apreciación de la prueba realizada por los Tribunales de Primera Instancia. Rivera Figueroa v. The Fuller Brush Co., 180 DPR 894 (2011); McConnell v. Palau, 161 DPR 734 (2004). Como norma general, no se descartará la apreciación de la prueba desfilada, las determinaciones de hechos y las adjudicaciones de credibilidad que haga el foro de instancia, a menos que haya indicios de pasión, prejuicio, parcialidad o error manifiesto. Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31 (2009); Serrano Muñoz v. Auxilio Mutuo, 171 DPR 717, 741 (2007); Argüello v. Argüello, 155 DPR 62, 79 (2001).

Ahora bien, distinto es el caso cuando los tribunales apelativos se enfrentan a la evaluación de determinaciones de hechos fundamentadas en la prueba pericial y documental. En tales situaciones, hemos dicho que este Tribunal está en igual posición de evaluarla, pudiendo adoptar su propio criterio en la apreciación o evaluación de la misma, incluso, hasta descartarla, aunque resulte técnicamente correcta. Dye-Tex P.R., Inc.

v. Royal Ins. Co., P.R., 150 DPR 658 (2000); Culebra Enterprises Corp. v. E.L.A., 143 DPR 935 (1997); Rodríguez Cancel vs. A.E.E., 116 DPR 443 (1985).

Como mencionáramos, en un caso de daños por impericia médica, el promovente de la acción debe establecer su caso mediante prueba pericial. Véase, Rodríguez Crespo v. Hernández, supra, pág. 649. Un perito "es una persona que, a través de la educación o experiencia, ha desarrollado un conocimiento o destreza sobre una materia de manera que puede formar una opinión que sirva de ayuda al juzgador". SLG v. Mini-Warehouse, 179 DPR 322, 338 (2010). También "es la persona entendida, el individuo competente, idóneo, por tener unas determinadas aptitudes y conocimientos, por poseer una adecuada capacidad". Íd.

En términos generales, podrán calificar y testificar como perito quienes posean especial conocimiento, destrezas, experiencias, adiestramientos o instrucción suficiente para cualificarlas como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Regla 703 de las Reglas de Evidencia, 32 LPRA Ap. VI; véase, además, E.L. Chiesa Aponte, Reglas de Evidencia Comentadas, San Juan, Ediciones Situm, 2016, pág. 243. Así pues, no se requiere grado académico ni publicaciones en el área particular de peritaje, así como tampoco tener licencia. Chiesa Aponte, op. cit., pág. 243; R. Emmanuelli Jiménez, Prontuario de Derecho Probatorio

puertorriqueño: nuevas Reglas de Evidencia 2010, 3ra ed., San Juan, Ediciones Situm, 2010, págs. 412-413; véase, además, Pueblo v. Echevarría, 128 DPR 299, 334 (1991). Ahora bien, lo anterior no le resta al hecho de que esto incide sobre el valor probatorio del testimonio pericial. Es decir, si bien es cierto que existe liberalidad en cuanto a la capacidad pericial esto no significa que "la mayor o menor competencia del perito sea irrelevante para apreciar su valor probatorio". Dye-Tex P.R., Inc. v. Royal Ins. Co., supra, págs. 663-664.

En esa línea, el valor probatorio del testimonio pericial dependerá de varios factores, entre los que se destacan los siguientes: (1) si el testimonio está basado en hechos o información suficiente; (2) si el testimonio es producto de principios y métodos confiables; (3) si la persona aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) la parcialidad de la persona testigo. Regla 702 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 702.

En varias ocasiones, hemos señalado que la especialidad del perito en un área determinada es decisiva en lo que respecta al valor probatorio que el juzgador de hechos le adjudique a su testimonio. Véase, E. L. Chiesa Aponte, Tratado de Derecho Probatorio, Tomo

I, Publicaciones JTS, 1998, pág. 594. Es por ello que la falta de especialidad incide sobre el peso de la prueba, más no en la cualificación de un testigo como perito. Dye-Tex P.R., Inc. v. Royal Ins. Co., supra, pág. 664.

**III**

En el presente caso, la parte peticionaria arguye que el Tribunal de Apelaciones omitió por completo la prueba desfilada en el juicio, relacionada a la norma de cuidado médico adoptada en la profesión en los casos de cáncer de ovario. Máxime cuando el tiempo de espera para una cirugía de estadio se aparta del "standard of care" según declarado por los testigos y perito de la UPR. Además, los peticionarios atribuyen la negligencia de los recurridos a la mala utilización de los recursos disponibles y al limitado juicio profesional a la hora de calendarizar las cirugías.

Por su parte, la UPR sostiene que no se le puede imputar responsabilidad a los médicos interventores por la falta de recursos que están fuera de su control. Particularmente, llamó a la atención el hecho de que para el 2012 en Puerto Rico solo existían tres (3) ginecólogos-oncólogos. Además, el volumen de pacientes era excesivamente alto y solo contaban con las salas de operaciones de la ASEM. Por otra parte, la UPR alega que la paciente fue orientada sobre el tiempo de espera para la cirugía y sobre otras alternativas de tratamiento fuera de Puerto Rico. De modo que la decisión de la Sra.

Sheila De Jesús Pagán de continuar con el plan establecido por la Clínica constituye causa suficiente para eximirlos de responsabilidad.

Ante los planteamientos encontrados, corresponde determinar si la parte peticionaria logró establecer un caso prima facie de negligencia médica. Para ello, se debe evaluar si, en primer lugar, demostró cuáles son las normas mínimas de conocimiento y cuidado médico aplicables al presente caso y, que la UPR causó los daños que resultaron de su incumplimiento con las mismas. En segundo lugar, si demostró que la UPR - como institución hospitalaria - se apartó de los criterios de razonabilidad y previsibilidad en el cuidado de la Sra. Sheila De Jesús Pagán.

Con ello en mente y luego de evaluar la prueba pericial vertida en el juicio, es forzoso concluir que el Tribunal de Apelaciones se apartó del estándar probatorio requerido en este tipo de caso, relevando equivocadamente a la UPR de responsabilidad. Veamos.

Respecto a las normas de conocimiento y cuidado médico, existe consenso unánime entre los testigos y peritos de las partes en cuanto a que la cirugía de estadio es el procedimiento adecuado para una paciente con cáncer de ovario y endometrio. En palabras sencillas, una cirugía de esta naturaleza sirve para identificar la magnitud y extensión de la enfermedad que aqueja a la paciente. Conforme al resultado que revele

la intervención, se procede a delinear el tratamiento adecuado; ya sea la remoción de tejidos, quimioterapia o radioterapia, según sea el caso. En ese sentido, la cirugía de estadio como plan a seguir no fue ni ha sido cuestionada en el presente caso.

Es decir, el verdadero problema estriba en el factor tiempo. Nos debemos preguntar, ante un cuadro clínico como el de la Sra. Sheila De Jesús Pagán y a tenor con el estándar médico, ¿cuál es el término de tiempo razonable que debe esperar una paciente para ser sometida a una cirugía de estadio? Distintas son las respuestas que brindaron los peritos de las partes. Por un lado, la doctora Ortiz Roque - perito de la parte peticionaria – afirmó que la cirugía debe realizarse dentro de sesenta y dos (62) días siguientes al diagnóstico. Fundamentó su contestación en el estándar médico prevaleciente en Europa para estos casos. Por otra parte, el doctor Rodríguez Arroyo – perito de la UPR - explicó que lo correcto es intervenir a la paciente en un periodo de seis (6) semanas, contadas desde que se obtienen los resultados de todas las pruebas. Tal aseveración está predicada en las normas de cuidado médico establecidas por el Gynecologic Oncology Group (GOG).

Ante la diferencia de criterios, se le debió otorgar mayor credibilidad y valor probatorio a las declaraciones del doctor Rodríguez Arroyo al respecto, dado que a

diferencia de la perito de la parte peticionaria, éste es especialista en ginecología-oncológica. Por tanto, a tenor con el testimonio del perito de la UPR, la cirugía de estadio de la Sra. Sheila De Jesús Pagán debía realizarse en un periodo de **seis (6) semanas** desde que se obtuvo el diagnóstico. Así, establecida la norma mínima de conocimiento y cuidado médico prevaleciente y aplicable al caso de autos, corresponde evaluar si la UPR se apartó de la misma. Para ello, debemos auscultar desde qué fecha comenzó a contar dicho término.

La parte peticionaria sugiere que las seis (6) semanas comenzaron a contar desde el 8 de agosto de 2012 cuando la paciente acudió por primera vez a la Clínica. Para ese entonces el cáncer de ovario ya había sido diagnosticado como resultado de la biopsia que le habían realizado en junio del mismo año; de modo que era suficiente para proceder con la cirugía de estadio. Sin embargo, debemos rechazar tal propuesta dado que surge de la prueba que la UPR tiene como política institucional referir a sus patólogos toda biopsia anterior que fuera realizada por otro centro patológico. Ello, a los fines de corroborar el diagnóstico original y evitar errores en el tratamiento. Tal proceder ciertamente es apropiado y se ajusta a la buena práctica de la medicina, según declarado por el perito de la UPR. Además, tampoco se debe tomar dicha fecha como punto de partida dado que era necesario y recomendable realizarle a la paciente una

biopsia de endometrio, junto con otros estudios pertinentes para tener un cuadro clínico más completo y certero previo al correspondiente tratamiento.

Por su parte, la UPR sostiene que las seis (6) semanas comenzaron a transcurrir el 17 de octubre de 2012, cuando la Clínica obtuvo oficialmente los resultados de las laminillas de la biopsia de ovario, confirmando el diagnóstico original: cáncer de ovario. Es decir, fue ese día cuando se logró completar el cuadro clínico de la paciente. Aun cuando pareciera correcta la teoría de la parte recurrida, debemos rechazarla. Primero, porque de haber sido el caso, con un simple cálculo matemático podemos concluir que las seis (6) semanas se cumplieron el 28 de noviembre de 2012, sin que la Sra. Sheila De Jesús Pagán fuera intervenida.

**Segundo, porque surge de la prueba que para el 5 de septiembre de 2012 el reporte de las laminillas de la biopsia de ovario ya estaba disponible. No obstante, la Clínica advino en conocimiento del resultado el 17 de octubre de 2012, cuando finalmente procuró el mismo directamente con patología. O sea, la UPR desperdició más de un mes en el tratamiento de la paciente; cuando mediante una simple gestión pudo haber conocido el resultado semanas antes.** Ante tales circunstancias, parece ser lo más adecuado computar las seis (6) semanas a partir del 5 de septiembre de 2012. No obstante, el tiempo recomendado se cumplió el 17 de octubre de 2012

sin que la Sra. Sheila De Jesús Pagán hubiera sido intervenida.[43]

Vemos pues, que en cualesquiera de los escenarios antes descritos la conclusión es la misma: la UPR se apartó del "standard of care" al no actuar conforme a la exigencia predicada en la profesión médica. Falló al no realizarle a la Sra. Sheila De Jesús Pagán la cirugía de estadio dentro de las seis (6) semanas recomendadas. Esperar hasta el 4 de diciembre de 2012, como lo hizo, para realizar la cirugía claramente no era concebible, ni siquiera para la parte recurrida. Así por ejemplo, el perito de la UPR declaró:

P      …¿qué…? ¿Entiende usted que es adecuado esperar hasta diciembre 4 para hacer la cirugía de estadio?

R     No.

P    ¿Por qué?

[…]

R     Yo digo que no porque nosotros establecimos que un paciente desde el momento en que lo recibo yo como profesional, al momento en que yo tenga una determinación de manejo de ese paciente, debe ser seis semanas.[44]

El doctor Rodríguez Arroyo reconoció que el cáncer de ovario puede desarrollarse en cuestión de semanas.[45] Éste estuvo de acuerdo en cuanto a que una oportuna

---

[43]Aun si calculáramos el término de seis (6) semanas a partir del 17 de octubre de 2012, el desenlace sería el mismo. La Sra. Sheila De Jesús Pagán no fue intervenida dentro del tiempo recomendado.

[44]Transcripción de la prueba oral de 9 de marzo de 2018, págs. 70-72.

[45]Íd., pág. 188.

intervención hubiera mejorado la prognosis de la Sra. Sheila De Jesús Pagán.[46] De igual manera, la doctora Umpierre Catinchi admitió que el tiempo de espera para la cirugía no era el apropiado, "no es lo óptimo".[47]

> P   Le pregunto doctora, qué distinto hubiese hecho usted en el tratamiento de la paciente que no hizo en aquel momento del 2012.
>
> R   Me hubiera … me hubiera encantado **poderla haber operado antes** de lo que…llevarla a Sala de Operaciones, para por lo menos poder documentar cuan extensa era su enfermedad en ese momento.[48]

Hay que añadir que, desde temprano en el caso, específicamente desde el 8 de agosto de 2012, la UPR tenía conocimiento de la urgencia que ameritaba intervenir a la paciente; cuando el doctor Santos Reyes, quien también trabajaba en la Clínica, solicitó una cita **"lo antes posible para cirugía"**. Además, advirtió que la paciente tenía un diagnóstico de cáncer de ovario posible estadio IA.

No cabe duda de que la prolongación de la cirugía en este caso repercutió en el progreso mortal de la enfermedad que padecía la Sra. Sheila De Jesús Pagán. Como apuntáramos, para los médicos de la UPR ello era totalmente previsible. "[S]iempre existe esa posibilidad porque no tenemos manera de saber cuánto tiempo va a tardar en progresar de una cosa a la otra. Por eso es que se sugiere a la gente que se intervenga lo antes

---

[46] Íd., pág. 198.
[47] Transcripción de la prueba oral de 7 de marzo de 2018, pág. 51.
[48] Íd., pág. 59.

posible".[49] En ese sentido, todo apunta a que la UPR fue negligente al no realizarle a la Sra. Sheila De Jesús Pagán la cirugía de estadio dentro del parámetro establecido para ello, apartándose del "standard of care". Es evidente que tal desviación es la causa próxima de la muerte de la Sra. Sheila De Jesús Pagán y, en consecuencia, de los daños sufridos por la parte peticionaria.

Ahora bien, a pesar de que la parte peticionaria estableció un caso prima facie de negligencia médica, ¿por qué el Tribunal de Apelaciones relevó a la UPR de responsabilidad por los alegados daños? Para justificar su decisión, el foro recurrido resaltó que la Sra. Sheila De Jesús Pagán fue orientada sobre el tiempo de espera para la cirugía y sobre su derecho de buscar otras alternativas. No solo eso, sino que familiares de ésta le ofrecieron ayuda para atenderse en los Estados Unidos. Tales aseveraciones dan la impresión de que dicho foro le atribuyó responsabilidad a la paciente por el hecho de haberse negado a acudir a un doctor en la práctica privada, en o fuera de Puerto Rico. No se puede validar ni pretender subsanar la conducta negligente de la UPR, fijándonos en la mera alegación de que la paciente tenía conocimiento sobre el tiempo de espera y sobre su derecho a indagar otras alternativas. Desde luego, es desacertado

---

[49] Íd., pág.52.

el razonamiento del tribunal apelativo intermedio al respecto.

Primero, porque es harto conocido que la Sra. Sheila De Jesús Pagán precisamente acudió a la Clínica porque carecía de los recursos económicos necesarios para sufragar cualquier tratamiento privado para su enfermedad. Evidencia de ello es que no pudo costear el tratamiento bajo el cuidado del doctor Santos Reyes en la práctica privada, por lo que fue referida a la Cínica. Además, no existe controversia en cuanto a que la paciente era beneficiaria del plan de salud del gobierno. Segundo, aun cuando la Sra. Sheila De Jesús Pagán tenía familiares en Estados Unidos, no surge de la prueba que el apoyo que pretendían brindarle fuera categóricamente de índole económico. En cualquier caso, la Sra. Sheila De Jesús Pagán entendió que la mejor decisión para su salud era continuar con el plan establecido por la Clínica. No por ello debe castigársele aminorando la validez de su reclamación contra los recurridos.

Como bien declararon los testigos de la UPR y reconoció el foro recurrido, para muchas mujeres con cáncer ginecológico la Clínica es la única alternativa que tienen para ser atendidas en el cuidado de su salud. Sin importar las razones que tengan para acudir a la misma, económicas o por conveniencia, confían en que recibirán un tratamiento adecuado, digno de la profesión que ejercen. De modo que la premisa del Tribunal de

Apelaciones respecto a que el conocimiento de la paciente sobre el tiempo de espera es eximente de responsabilidad - avalada por la UPR en su escrito, resulta patentemente equivocada.

En segundo orden, para justificar el relevo de responsabilidad de la UPR, el tribunal recurrido tomó conocimiento judicial sobre la crisis de subespecialistas en ginecología-oncológica en Puerto Rico para el 2012-2013. Hecho que no pretendo refutar, puesto que surge de la prueba que para la fecha solo existían tres (3) ginecólogos-oncólogos en la Isla, de los cuales dos (2) trabajaban para la Clínica. Ahora bien, hay que destacar que la crisis económica a la que alude tanto el foro recurrido como la UPR, no es reciente ni tampoco se remonta a la fecha de los hechos. Sino que la falta de subespecialistas en la materia es un hecho que viene ocurriendo hace más de treinta (30) años.[50] Atribuyen tal

---

[50] La doctora Romaguera Agrait declaró:

P ¿A qué usted se refiere con "problemas de infraestructura"?

R Primero que nada, los fondos para poder tener más personal…

P Unjú…

R …verdad, específicamente los ginecólogos oncólogos…

[…]

P Ajá. ¿Para tener personal? Okey.

R Sí, porque si no tenemos la infraestructura económica para poder pagarle, no podemos tener…

[…]

R Muchas veces equipo…

[…]

R …que llevamos hace mucho tiempo, pero ahora esta más…mas presente en nuestra mesa, pues, muchas veces tenemos que cancelar pacientes porque no tenemos el equipo.

situación a la falta de recursos económicos para contratar más personal y equipos.[51] Sin importar lo anterior y conscientes de su deficiencia en el manejo de los casos, la Clínica continúa aceptando pacientes. Para la doctora Romaguera Agrait – testigo de la UPR, esto no cumple con el "standard of care".

> P    "Sí". ¿Y eso usted entiende que cumple con el "standard of care"?
>
> R    No, yo no considero que eso cumple con el "standard of care". Muchas veces nosotros no podemos seguir nuestros "standard of care".[52]

No podemos rayar en lo automático y avalar la práctica de la Clínica de ofrecer sus servicios en condiciones precarias. El que ello haya ocurrido así por tantos años, convirtiéndose en un hábito, no justifica que la UPR se desvíe de las normas establecidas en la comunidad médica. Lo único que ello denota es la irresponsabilidad de la UPR en la administración de sus recursos y no por ello podemos perjudicar a los pacientes que a ciegas ponen en sus manos el cuidado de su salud. Como dijéramos, en una causa de acción por negligencia médica los hospitales también responden por los daños sufridos, siempre que su conducta se hubiese apartado de

---

P   ¿Y eso es ahora o en el 2012?
R   Eso es desde que yo soy residente.
P   Esa era la próxima pregunta. O sea, ¿esto lo viene viendo desde que usted era estudiante?
R   Esto yo lo he vivido treinta y ocho años de mi vida.
    Véase, transcripción de la prueba oral de 8 de marzo de 2018, págs. 36-37.
[51]Íd.
[52]Íd., pág. 38.

los criterios de razonabilidad y previsibilidad en el cuidado del paciente.

Según discutido a la saciedad, la cirugía de estadio era esencial para conocer la extensión del cáncer y el tratamiento a seguir. Así, aun cuando las salas de operaciones son administradas por un tercero, es la Clínica quien tiene el poder decisional de programar las cirugías, siempre que lo haga durante los días asignados. Aferrarse a la costumbre de calendarizar las cirugías por orden de llegada, sin tan siquiera considerar elementos de necesidad y de riesgo de la paciente resulta inexcusable. No cabe duda de que los recurridos se apartaron de su responsabilidad con las pacientes que los visitan, faltando a su deber de diligencia en el cuidado de sus vidas.

De igual modo, la salud y vida de una persona no puede estar condicionada ni ser perjudicada por la falta de recursos. En ese sentido, la UPR tiene la obligación de contar con las facilidades, equipos y sistemas de administración necesarios para suplir su capacidad de asistencia. De lo contrario, incurre en negligencia.

Es un hecho incontrovertido que la Clínica tiene asignado un (1) solo día en la semana, en ocasiones dos (2), las salas de operaciones para realizar procedimientos ginecológicos. Esta distribución de las salas resulta similar a la práctica privada, donde al doctor Rodríguez Arroyo le asignan dos (2) días en semana

para realizar sus procedimientos. No obstante, en el caso de la UPR la limitación en el equipo es uno de los factores que impide el aprovechamiento óptimo de las salas de operaciones. Ello, toda vez que se utiliza el mismo equipo en todos los procedimientos; permitiendo que el proceso de limpieza de estos retrase las operaciones. Bajo tales circunstancias, la Clínica solo logra realizar hasta dos (2) operaciones por día; mientras que en la práctica privada el perito de la UPR realiza hasta ocho (8) operaciones al día. Ciertamente, la limitada disponibilidad de equipos contribuye a la determinación de incumplimiento de la UPR con su deber de contar y proveer los recursos necesarios para los servicios que ofrece. Recordemos que la responsabilidad de los hospitales no se mide por el hecho de que sea una institución hospitalaria pública o privada. Su sentido de responsabilidad y compromiso para con sus pacientes y visitantes debe cumplir siempre con las normas de cuidado vigentes en la profesión.

Otro punto importante es que la UPR carece de un protocolo de comunicación, que de alguna manera permita una comunicación directa y eficiente entre la Clínica y las salas de emergencias, respecto al cuidado de sus pacientes. Ello cobra mayor importancia en este caso puesto que la doctora Umpierre Catinchi le dio instrucciones a la Sra. Sheila De Jesús Pagán para que acudiera a sala de emergencias si su condición empeoraba

fuera de horas laborales. Lo cual, en efecto, ocurrió en cuatro (4) ocasiones. En una de sus visitas a la sala de emergencias, particularmente, el 22 de noviembre de 2012, le identificaron una masa pélvica de 18 c.m. Dicha información tan valiosa nunca llegó a oídos de la doctora Umpierre Catinchi ni de la Clínica, por lo que no se tomó acción sobre ello.

En definitiva, la UPR fue negligente al incumplir con su obligación de proveerle atención médica de cuidado a la Sra. Sheila De Jesús Pagán conforme a la mejor práctica de la medicina y dentro de los linderos de la prudencia y razonabilidad. La falta de recursos económicos y de personal no debe servir de excusa para ninguna institución hospitalaria que infrinja el derecho de todo paciente a recibir servicios de salud de la más alta calidad, consistente con los principios generalmente aceptados en la práctica de la medicina. En consecuencia, la UPR responde por los sufrimientos y angustias mentales sufridos por la parte peticionaria.[53] En virtud de lo anterior, resulta innecesario entrar a considerar el segundo señalamiento de error.

**IV**

Por los fundamentos antes expuestos, estoy conforme con revocar la sentencia del Tribunal de Apelaciones y

---

[53]Recordemos que la causa de acción contra el tercero demandado - Gobierno de Puerto Rico, se encuentra paralizada en virtud de la Ley PROMESA. Una vez se decrete el levantamiento de la paralización, la UPR puede continuar con su reclamación contra esta parte.

reinstalar la sentencia emitida por el Tribunal de Primera Instancia.


                              Luis F. Estrella Martínez
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Sucesión Celia Pagán Berríos y otros<br><br>Peticionarios<br><br>v.<br><br>Universidad de Puerto Rico, Recinto de Ciencias Médicas y otros<br><br>Recurridos<br><br>v.<br><br>Administración de Servicios Médicos de Puerto Rico y otros<br><br>Terceros demandados | CC-2019-0518 | |

Opinión Disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico a 25 de febrero de 2021.

Este Tribunal impone responsabilidad civil a la Clínica de Ginecología-Oncológica de la Universidad de Puerto Rico (en adelante, "Clínica UPR"), porque alegadamente incumplió con su obligación de proveer atención médica a la Sra. Sheila De Jesús Pagán. La supuesta negligencia estriba en que la Clínica de la UPR no le realizó a la señora De Jesús Pagán una cirugía de estadio antes de la fecha establecida por la Administración de Servicios Médicos de Puerto Rico (ASEM), entidad encargada de proveer el acceso a las salas de operaciones del Centro Médico, para que las usen las

clínicas de la Escuela de Medicina del Recinto de Ciencias Médicas de la UPR.

Lamentablemente, este Tribunal le imputa responsabilidad a la Clínica de la UPR por algo que está fuera de su control. No lo está por la sencilla razón de que es ASEM y no la Clínica de la UPR la proveedora y responsable de las salas de operaciones en las cuales los doctores de la Clínica de la UPR realizan cirugías.

Por lo tanto, no se cumple el criterio de nexo causal entre el acto médico y el daño sufrido. Weber Carrillo v. ELA et al., 190 DPR 688, 722 (2014); Nieves Díaz v. González Massas, 178 DPR 820, 843 (2010). Véanse, además: López v. Porrata Doria, 169 DPR 135 (2006); Soto Cabral v. ELA, 138 DPR 298, 309 (1995). Por eso disiento respetuosamente.

I.

El 28 de junio de 2012, se removió el ovario derecho a la señora De Jesús Pagán. Como parte de esta intervención, se realizó una prueba patológica del tejido removido, que arrojó que la señora De Jesús Pagán padecía de cáncer de ovario.

Con este resultado, la señora De Jesús Pagan acudió el 6 de agosto de 2012 a la oficina del Dr. Luis Santos Reyes, quien tiene una práctica privada de ginecología-oncológica. El doctor Santos Reyes refirió a la señora De Jesús Pagán a la Clínica de la UPR, porque él no aceptaba el plan médico del gobierno.

Así, el 8 de agosto de 2012, la señora De Jesús Pagán visitó la Clínica de la UPR. Inmediatamente la atendió la Dra. Sharee Umpierre Catinchi. Como parte de la evaluación inicial, la doctora Umpierre Catinchi le realizó a la señora De Jesús Pagán un examen pélvico, una biopsia de endometrio y un *Papanicolau*. La Clínica de la UPR calendarizó una cita de seguimiento para el 29 de agosto de 2012.

Ese día, la doctora Umpierre Catinchi informó a la señora De Jesús Pagán que los resultados de los exámenes arrojaron que padecía de cáncer en el endometrio. **Así, la Clínica de la UPR pautó la cirugía de estadio para el 4 de diciembre de 2012, <u>la cual era la próxima fecha disponible que tenía ASEM para que operaran en sus facilidades</u>.**

Con el fin de estudiar las opciones de fertilidad de la señora De Jesús Pagán, el 6 de septiembre de 2012 la doctora Umpierre Catinchi la refirió al Programa de Fertilidad de la Clínica de la UPR. Tras asistir a la consulta, la señora De Jesús Pagan desistió de la idea de preservar óvulos y decidió continuar con el tratamiento de cáncer de ovario.

Una semana después de la visita al Programa de Fertilidad de la Clínica de la UPR, el 12 de septiembre de 2012, la señora De Jesús Pagán y sus familiares acudieron a una cita de seguimiento a la Clínica de la UPR. **En esa ocasión, según consta en el récord médico, fueron orientados sobre la deseabilidad de adelantar la fecha de la cirugía, pero que ello era bien difícil ante la**

**indisponibilidad de las salas de operaciones en el Centro Médico. Así, se ofreció a la paciente la opción de referirla a un ginecólogo-oncólogo privado para una intervención quirúrgica más temprana.**

El 17 de octubre de 2012, la señora De Jesús Pagán visitó por última vez la Clínica de la UPR. Surge del expediente que en esa ocasión se quejó de dolor intermitente en el lado izquierdo. Luego de una primera gestión por parte de la Clínica de la UPR, ASEM le remitió los resultados de la patología de las laminillas que recogían el tejido de la biopsia del ovario extirpado el 28 de junio de 2012. **Ese resultado confirmaba la patología hecha el 5 de julio de 2012.** De igual manera, se le informó a la Sra. De Jesús Pagán que si sentía dolor o si su condición de salud empeoraba, acudiera a la Clínica de la UPR y que si la condición empeoraba en horas no laborables, acudiera a cualquier sala de emergencia.

Al transcurrir el tiempo, la condición de salud de la señora De Jesús Pagán empeoró. Esto requirió que esta acudiera en al menos siete (7) ocasiones a salas de emergencias. En ninguna de esas vistas se le realizó a la señora De Jesús Pagán estudio alguno para auscultar el origen del dolor abdominal pélvico. Tampoco se desprende del récord médico que la señora De Jesús Pagan o el hospital donde fue atendida le notificara a la Clínica de la UPR las complicaciones médicas que atravesaba.

El 4 de diciembre de 2012, la doctora Umpierre Catinchi atendió a la señora De Jesús Pagan como parte del

proceso de exámenes previos al inicio de la cirugía de estadio ese día. Estos exámenes demostraron, lamentablemente, que la señora De Jesús Pagán ya no era candidata para la cirugía de estadio, porque su cáncer de ovario había metastizado.

Tras varios estudios, la señora De Jesús Pagán fue dada de alta el 6 de diciembre de 2012. Una semana después, el 13 de diciembre de 2012, la señora De Jesús Pagan tuvo que ser llevada de emergencia al Hospital Cristo Redentor y posteriormente trasladada al Hospital Universitario de Adultos. El diagnóstico médico era sepsis severa, hipocalemia y fallo renal. Lamentablemente, la señora de Jesús Pagán falleció el 2 de enero de 2012.

Así las cosas, el 21 de noviembre de 2014, la parte peticionaria presentó demanda sobre daños y perjuicios contra la Universidad de Puerto Rico, Recinto de Ciencias Médicas, la Escuela de Medicina y varios demandados desconocidos. Ap. Sol. Cert., págs. 77-80. Oportunamente, la Universidad de Puerto Rico contestó la demanda y negó la negligencia imputada.

Luego de varios tramites, **el 19 de febrero de 2016,** la Universidad de Puerto Rico, presentó una demanda de tercero contra el Estado Libre Asociado (ELA) y ASEM. La causa de acción contra el ELA quedó paralizada en virtud de la Ley Promesa, 48 U.S.C. secc. 2101, et seq. Ap. Sol. Cert., pág. 166. En el caso de ASEM, el foro primario desestimó la demanda de tercero, porque la estimó prescrita. Ap. Sol. Cert., págs. 169-176.

II.

Como primer paso, es menester distinguir la personalidad legal de la Clínica de la UPR de la de ASEM.

ASEM se creó mediante la Ley Núm. 66 de 22 de junio de 1978, 24 LPRA sec. 342 et seq., según enmendada, conocida como la "Ley de la Administración de Servicios Médicos de Puerto Rico". Allí, el legislador estableció las funciones y personalidad legal de ASEM. En específico, en el Art. 3, 24 LPRA sec.342b, se dispuso lo siguiente:

> "Artículo 3. - Creación; exención de contribuciones y derechos.
> Se crea la Administración de Servicios Médicos de Puerto Rico, como instrumentalidad del Gobierno del Estado Libre Asociado de Puerto Rico, adscrita al Departamento de Salud del Estado Libre Asociado de Puerto Rico independiente y separada de cualquier otra administración u organismo creado o que se cree en el futuro en el Departamento de Salud y la cual estará bajo la dirección y supervisión del Secretario de Salud. **Dicha Administración tendrá personalidad legal separada de todo funcionario de la misma y del Gobierno del Estado Libre Asociado de Puerto Rico y sus agencias, instrumentalidades, corporaciones públicas y subdivisiones políticas.** (Énfasis suplido.)

Como se advierte, el legislador confirió a ASEM personalidad jurídica independiente de todas las instrumentalidades o dependencias del Gobierno. Entre esas está la Universidad de Puerto Rico, una corporación pública. Véase, Art. 3.1 de la Ley Núm. 1 de 20 de enero de 1966, según enmendada, conocida como la "Ley de la Universidad de Puerto Rico", 18 LPRA sec. 602a.

Por otro lado, las clínicas del Recinto de Ciencia Médicas fueron creadas por la Ley de la Universidad de Puerto Rico. Esta pieza legislativa autorizó a la

Universidad de Puerto Rico a crear planes de practica universitaria intramural en sus unidades. Íd., Art. 12(g). 18 LPRA sec. 612(g). Véase, Rodriguez Ruiz v. Hosp. San Jorge, 169 DPR 850, 868 (2007).

En virtud de dicha encomienda, se crearon los "Planes de Práctica Universitaria Intramural" (en adelante "Planes"). Certificación Numero 123, 1996-97, Reglamento para la creación y administración de Planes de Practica Universitaria Intramural en la Universidad de Puerto Rico. Estos Planes tenían la encomienda de "ofrecer servicios mediante contratos, a personas e instituciones públicas y privadas utilizando personal docente y de apoyo que participe voluntariamente, generando recursos para la institución y el personal participante". Art. 15(a)(10) de la Ley de la Universidad de Puerto Rico, 18 LPRA sec. 614(a)(10). Además, los contratos hechos al amparo de los Planes, como el de la Clínica de Ginecología-Oncológica, se otorgan a nombre de la Universidad de Puerto Rico y son suscritos, en representación suya, por el Rector de la unidad correspondiente. Art. XII, Certificación Núm. 123 1996-97. De igual forma, la Universidad de Puerto Rico y por consiguiente todas sus dependencias, "tendrá autoridad para demandar y ser demandada". Art. 3.1 de la Ley de la Universidad de Puerto Rico, supra.

En resumen, queda claro que la UPR y ASEM ostentan personalidad legal separada e independiente una de la otra. Por lo tanto, están sujetas a responder de manera individual por los daños que causen.

Delimitada la personalidad jurídica de ambas entidades, veamos si la Clínica de la UPR es responsable por los daños a los recurridos.

III.

Para la correcta disposición del caso, bastaba aplicar los tres criterios básicos para probar cualquier acción en daños por impericia médica, a saber: (1) la ocurrencia de un acto médico culposo y negligente; (2) la producción de un daño real y (3) **la relación causal entre el acto médico y el daño sufrido**. Arrieta v. De la Vega, 165 DPR 538, 548-549 (2005).

Como los primeros dos criterios se cumplieron, paso a discutir el tercero. Hemos expresado que, en materia de relación causal, rige la doctrina de la causalidad adecuada, lo cual quiere decir que no será causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general. Nieves Díaz v. González Massas, supra; López v. Porrata Doria, 169 D.P.R. 135, 151-152 (2006).

Ese principio establece que en todo caso en que se reclame compensación por daños y perjuicios, el demandante tiene que establecer en forma preponderante que la negligencia del demandado fue la que con mayor probabilidad causó el daño sufrido. Este concepto de la causa próxima postula, además, que la ocurrencia del daño que da base a la reclamación era previsible dentro del curso normal de los acontecimientos. En otras palabras,

causa es la condición que ordinariamente produce el daño, según la experiencia general, y este nexo causal puede romperse ante la ocurrencia de un acto extraño. Nieves Díaz v. González Massas, supra; López v. Porrata Doria, supra. **Ese nexo causal será imprescindible en una reclamación en daños y perjuicios, ya que es el elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico.** Rivera v. S.L.G. Díaz, 165 D.P.R. 408, 422 (2005)

Evidentemente, la mayoría concluye que la Clínica de la UPR se apartó de la norma mínima de cuidado médico, al no realizarle a la señora De Jesús Pagan la cirugía de estadio dentro de las seis semanas, como indicaron los peritos. Es cierto que la espera que experimentó la señora De Jesús Pagán para realizarse la cirugía de estadio no fue adecuada, según los estándares médicos. No obstante, difiero en imputarle la demora a la Clínica de la UPR, porque esa institución académica no tiene el control de la disponibilidad de las salas de operaciones.

Del expediente queda claro que la Clínica de la UPR - al momento de los hechos- no contaba con salas de operaciones para llevar a cabo sus procedimientos y **dependía de la disposición de las salas de operaciones del Centro Médico de Puerto Rico, que administraba ASEM.** Ap. Sol. Cert., págs. 11 y 14. Además, esas salas de operaciones de ASEM no son exclusivas para los pacientes de la Clínica de la UPR. Se comparten con pacientes de Ortopedia, Cirugía General, Neurocirugía, Oftalmología,

Otorrinolaringología, entre otros. Ap. Sol. Cert., pág. 11. Esas son facilidades independientes de la UPR.

La Opinión de Conformidad establece erróneamente que "aun cuando las salas de operaciones son administradas por un tercero, es la Clínica quien tiene el poder decisional de programar las cirugías". Opinión de Conformidad, pág. 35. A la Clínica de la UPR se le asignan los días de las salas de operaciones a base de un libro que provee ASEM, del que surgen las fechas disponibles. Ap. Sol. Cert., pág. 6. No es correcto que la Clínica era la responsable de asignar las fechas de operación. Según se desprende de los hechos incontrovertidos, la Clínica de la UPR asignaba las fechas de operaciones según el orden de llegada de los pacientes y de la disponibilidad que ASEM le proveía en el libro de fechas elegibles para operaciones.

También hay que considerar que a un número considerable de los casos que llegan a la Clínica de la UPR se les tiene que hacer una cirugía de estadio. Tanto los testigos como los peritos de las partes y hasta la misma Opinión de Conformidad reconocen que esa intervención quirúrgica es necesaria y acorde al estándar médico para identificar la extensión de la enfermedad y el tratamiento adecuado para los pacientes. Opinión de Conformidad, pág. 27.

**Ninguna de las partes estableció que, de los estudios preliminares realizados a la señora De Jesús Pagán, se desprendiera que su condición ameritaba una atención preferencial sobre los demás pacientes que atendía la**

**Clínica de la UPR**. Después de todo, esta es una clínica que atiende pacientes en etapas críticas. Tampoco argumentaron que se trataba de un caso clínico que ameritara que la Clínica de la UPR abogara a ASEM por una fecha antes de la que esta última proveyó.

Por otro lado, la Opinión de Conformidad aduce que "la UPR tiene la obligación de contar con las facilidades, equipos y sistemas de administración necesarios para suplir su capacidad de asistencia. De lo contrario, incurre en negligencia." Opinión de Conformidad, págs. 35-36. Si lo que se le está requiriendo a la Clínica de la UPR, para que no haya impericia médica, es que no dependa de las salas que le asigna ASEM, lamento que, **tratando de remediar un daño, se esté causando uno mayor. Como la única manera de cumplir con eso es que la Clínica tenga facilidades para operar bajo su control exclusivo y estas no existen, la única solución para cumplir con este criterio legal es cesar de operar pacientes.**

La pérdida de una vida por falta de recursos médico-hospitalarios nos indigna a todos. Sin embargo, eso no nos puede llevar a imponer requisitos legales imposibles de cumplir ni a imponer responsabilidad a una entidad por razones que están fuera de su control. La Clínica de la UPR tiene como propósito brindarle tratamiento médico al pueblo puertorriqueño, en particular a los desventajados económicamente. Imponerle responsabilidad civil por impericia médica a la Clínica de la UPR, por un daño del que no es responsable y que no puede remediar,

probablemente provoque el cese de sus funciones quirúrgicas. Esto perjudicará directamente a los miles de puertorriqueños de escasos recursos que dependen de los servicios médicos que allí se ofrecen.

Conviene recordar lo que expresamos en Lozada v. E.L.A., 116 DPR 202, 213 (1985), citando a Oliveros v. Abréu, 101 D.P.R. 209, 226 (1973):

> Aunque aspiramos al ideal de excelencia en la práctica de la medicina, la determinación de lo que constituye negligencia, por la posesión o carencia de equipo, necesariamente se nutre de diversos factores. Esta fórmula se explica porque al "fijar la norma debemos y queremos ser justos y razonables. **No vamos a exigir requisito y condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos**" (Énfasis suplido).
> Véase, además, Blás v. Hosp. Guadalupe, 146 DPR 267, 324 (1998).

Por otro lado, el Tribunal erróneamente le imputa responsabilidad a la Clínica de la UPR porque esta no cuenta con el equipo necesario para realizar las cirugías. La Opinión de Conformidad expone en lo pertinente:

> En el caso de la UPR la limitación en el equipo es uno de los factores que impide el aprovechamiento óptimo de las salas de operaciones. Ello, toda vez que se utiliza el mismo equipo en todos los procedimientos; permitiendo que el proceso de limpieza de estos retrase las operaciones. Bajo tales circunstancias, la Clínica solo logra realizar hasta dos (2) operaciones por día; mientras que en la práctica privada el perito de la UPR realiza hasta ocho (8) operaciones al día. **Ciertamente, la limitada disponibilidad de equipos contribuye a la determinación de incumplimiento de la UPR con su deber de contar y proveer los recursos necesarios para**

**los servicios que ofrece. Recordemos que la responsabilidad de los hospitales no se mide por el hecho de que sea una institución hospitalaria pública o privada.** Su sentido de responsabilidad y compromiso para con sus pacientes y visitantes debe cumplir siempre con las normas de cuidado vigentes en la profesión. Opinión de Conformidad, pág. 36. Énfasis nuestro.

En primer lugar, la Opinión de Conformidad cataloga a la Clínica de la UPR como una facilidad hospitalaria. Eso no es correcto. La Clínica de la UPR solo brinda servicios de diagnóstico a los pacientes y sus médicos realizan intervenciones quirúrgicas en las facilidades hospitalarias que al momento de los hechos administraba ASEM. Es Centro Médico (administrado por ASEM) y no la Clínica de la UPR, la institución que ofrece servicios hospitalarios.

En segundo lugar, la Opinión de Conformidad deja entrever que la Clínica de la UPR es la entidad que suministra los equipos para realizar las intervenciones quirúrgicas que se llevan a cabo en las facilidades hospitalarias que administra ASEM. Eso también es erróneo. La misma ASEM, en el "Informe sobre conferencia preliminar entre abogados", reconoce que es ella la que suministra los equipos requeridos para las salas de operaciones. Expresó:

> [L]os médicos de x especialidad pueden usar además de la Sala asignada a sus Servicios o Departamento, cualquier otra sala de operaciones que no se esté utilizando en ese momento. Ello en particular cuando los equipos que se requieren para la cirugía no están fijos en la pared o piso de la sala de

operaciones. Los equipos necesarios en el caso que nos ocupa y que han sido mencionados por la UPR se pueden mover de una sala a otra al igual que se reúsan luego de sr limpiados y esterilizados. Ap. Sol. Cert., pág. 131.

Como se nos advierte con claridad, la Clínica de la UPR no es la entidad responsable de proveer los equipos necesarios para llevar a cabo las correspondientes operaciones. Esa responsabilidad es de ASEM, como ente administrador del Centro Médico.

En definitiva, el récord médico y el tracto de los hechos demuestran que la Clínica de la UPR actuó conforme a los estándares aceptados por la medicina, al brindarle a la señora De Jesús Pagán un diagnóstico acertado y con la premura que los recursos a su disposición permitían. Es ante la falta de acceso a las salas de operaciones, provistas por ASEM, que la Clínica de la UPR no pudo candelarizar una fecha para operar antes de la pautada para la cirugía de estadio. Es por eso que no se cumple el requisito de nexo causal entre el daño que sufrió la señora De Jesús Pagán y la Clínica de la UPR.

IV.

La determinación de una mayoría de este Tribunal provocará que la Clínica de la UPR y sus médicos se replanteen si les es factible continuar brindando los servicios que ofrecen hoy a la comunidad. ¿Esa es la justicia que este Tribunal busca? Estoy seguro de que no. Sin embargo, esa es la consecuencia indirecta que tendrá la determinación de este Tribunal. **En el afán de que**

**alguien responda, no podemos imponer responsabilidad a quien no la tiene. En otras palabras, para hacer justicia no podemos cometer una injusticia.** Por los fundamentos antes expuestos, disiento respetuosamente.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado